NORTHPARK NATIONAL
BANK, Plaintiff,

v.

BANKERS TRUST CO., Federal Reserve
Bank of New York and Federal Reserve
Bank of Chicago, Defendants.

No. 82 Civ. 7417 (WK).

United States District Court,
S.D. New York.

Sept. 26, 1983.

Hart & Hume, Mark Gamell, Benjamin D. Lentz, New York City, for plaintiff.

Thomas C. Baxter, Jr., New York City, for defendant Federal Reserve Bank of New York.

Oliver Ireland, New York City, for defendant Federal Reserve Bank of Chicago.

## MEMORANDUM & ORDER

WHITMAN KNAPP, District Judge.

On November 7, 1979 a customer of plaintiff—a Dallas bank—deposited with it a $62,500 check and thereby set in motion a clever fraud which would result in his bilking plaintiff out of some $60,000, and in the institution of this lawsuit to determine who should ultimately be left holding the proverbial "bag." The case is before us on defendant Federal Reserve Bank of New York's (FRBNY) motion to dismiss for failure to state a claim and on defendant Federal Reserve Bank of Chicago's (FRBC) motion to dismiss for lack of personal jurisdiction. This opinion deals only with the motion by the FRBNY; the application by the FRBC is considered in a separate opinion reported at 572 F.Supp. 520.

## BACKGROUND

Two features of the modern check collection process are central to the understanding of this fraud. The first is that, notwithstanding the colloquial suggestion to the contrary, checks deposited for collection do not generally "clear." That is, provisional credits—on the customer's account at the depositary bank and on the accounts of intermediary banks involved in the collection process—become final by the mere passage of time, rather than by an advice of actual payment. *See* Uniform Commercial Code (UCC) § 4–213.[1] *See also* 6 Reitman Banking Law § 135.08 (1981). It being statistically unlikely that a particular check will not be paid, *see* UCC § 4–212 comment 1, the practicalities of the process call for giving actual notice (down the chain of collection) only in the event a check is *not* paid. Accordingly, the temporary hold which a depositary bank customarily places on the withdrawal of proceeds from a check deposited for collection is intended to give the collection chain an opportunity to notify the depositary bank, if it be necessary, that the check has not been paid. Thus, the hallmark of the normal completion of collection—*i.e.*, the check having been paid—is the receipt of *no notice* by the depositary institution.

The second important feature is that the collection process has been, of course, automated by the use of check-sorting comput-

---

1. We need not consider which state "version" of the UCC is applicable to this case. The parties have pointed out no state variation—and our own research discloses none—which is material to the statutory issues before us. Moreover, the legislative history which sheds light on the issues in this case is that of the early efforts—by the American Law Institute and the National Conference of Commissioners of Uniform State Laws—to draft a "uniform" commercial code. *See, generally,* R. Braucher, *The Legislative History of the Uniform Commercial Code,* 58 Colum.L.Rev. 798 (1958) (summary of the early history of the UCC). Accordingly, we refer only to the Permanent Editorial Board's version and have, therefore, sought guidance in appropriate federal and state case law, irrespective of jurisdiction.

ers. *See Bank Leumi Trust v. Bally's Park Place* (S.D.N.Y.1981) 528 F.Supp. 349, 350–51. The vast amount of items processed allows no practical alternative. *See* 68 Annual Report, Board of Gov. of the Fed.Res. Syst. 233, table 9 (1981) (more than 16 billion checks handled in 1981); Aldom, Purdy, Schneider & Whittingham, Automation in Banking 13–15 (1963); UCC § 4–101 comment. Along the bottom of a check's face there are so-called "MICR numbers"[2] which identify the drawer's bank, branch, and account number. A computer "reads" these numbers and automatically routes the check to the appropriate destination for collection. The initial destination depends, therefore, entirely on the MICR routing number printed on the check.

With the foregoing in mind it is clear how a fraud of this type is accomplished. Its object is to cause a worthless check deposited for collection to take a sufficiently long detour in its progress to the drawee bank, to insure that the notice of non-payment will not arrive at the depositary bank until after the expiration of the hold which it placed on the availability of the proceeds from transit items.[3] Having received no such notice before the expiration of the hold, the depositary bank supposes the items to have been paid and allows its proceeds to be withdrawn. By the time notice arrives the malefactor has, of course, absconded with the spoils. The crucial detour is caused by imprinting the fraudulent

check with the wrong MICR routing number—*i.e.,* one that does not correspond to the bank designated on the face of the check as the drawee bank, but to a different bank, preferably one that is distant from the institution designated as the drawee bank on the face of the check. The fraudulent check in our case bore the MICR routing number of Bankers Trust Co. in New York and identified the "Bank of Detroit"—a fictitious institution—as the drawee bank.[4]

A brief chronology is now in order. The malefactor[5] deposited the fake check in his account with plaintiff on November 7, 1979. Plaintiff put a 14-day hold—through November 20—on the availability of the check's proceeds. On the next day, November 8, the check was presented to the Republic National Bank of Dallas—plaintiff's correspondent bank for out-of-state collections—which, in turn, presented the check on November 9 directly to the FRBNY for collection, without routing the item through the local Federal Reserve Bank of Dallas. *See* 12 C.F.R. § 210.4 (1983) (allowing "direct send" to Federal Reserve Banks). The complaint goes on to allege that the check bears a stamp showing that it had been presented to Bankers Trust Co. for collection on November 13. The precise timing of events during the next few days has not yet been established. It is clear, however, that at some time after November 13, Bankers Trust determined that the check

---

**2.** "MICR" stands for "Magnetic Ink Character Recognition."

**3.** The "bet" on which the fraud must proceed is that the length of the "hold" is established on the assumption that the check will not be "detoured," but will be sent directly to the drawee bank.

**4.** The fact that the "Bank of Detroit" does not exist is immaterial to this motion. As we understand the mechanics of this fraud, it would work as well if the institution identified as the drawee bank on the face of the fraudulent check were a "real" bank, or if the account on which the check is ostensibly drawn were a "real" account. It is irrelevant whether the fraudulent check is returned unpaid because the drawee "bank" does not exist, because the account on which it is drawn at a (real) drawee

bank does not exist, or because the (real) account on which it is drawn at a (real) drawee bank is without funds. The outcome of this motion should not depend, in our view, on the fortuitous choice of check "style" which the malefactor has made. In this connection we observe, moreover, that defendant's penchant for referring to the fraudulent check as a "noncheck" on grounds that it was not drawn "on a bank," *see* UCC § 3–104(2)(b), is of no legal moment.

**5.** The complaint does not indicate whether the plaintiff's client was the malefactor or a victim who had dealt with one. At oral argument plaintiff's counsel advised us, however, that the (former) customer can now be found in a Pennsylvania jail, presumably on account of a less successful venture than the one which spawned this litigation.

was not drawn on it and returned the item to the FRBNY. The FRBNY, having now extracted the check from the computer-directed addressing system, then forwarded the check to the FRBC on the strength of the designation "Bank of Detroit" which the check bore on its face.[6] The complaint states that the check is stamped as having been in the hands of the FRBC on November 20. Meanwhile, back in Dallas, the malefactor withdrew $9,000 from his account on November 21 and an additional $40,250 on Saturday, November 24. The precise schedule of the check's vicissitudes after November 20 is yet undetermined. It must, however, have been sent to the Detroit branch of the FRBC, which branch, in turn, established that the "Bank of Detroit" did not exist. The check must then have followed the self-same route back to the FRBC and then to the FRBNY. The complaint alleges that the FRBNY again received the check on November 29, well after the malefactor had eloped with the plundered funds, leaving—we suppose—a barren account. What happened to the check thereafter is immaterial. Suffice it to say that the Federal Reserve Bank of Dallas

advised plaintiff some time in December that the check would be returned unpaid, and upon the check's return debited plaintiff's account at the Dallas Fed for the amount of the phony check.

## DISCUSSION

The complaint is altogether parsimonious in describing the legal foundation of the charges against the FRBNY. As developed in its submission in opposition to the FRBNY's motion, the specific legal grounds for plaintiff's claim are that, having received the check unpaid from the FRBC on November 29, the FRBNY (a) failed timely to send notice or timely to forward the check down the collection chain, as required by UCC § 4–212(1)[7] and, therefore, forfeited its right to charge-back under that provision; that, having received the unpaid check from Bankers Trust on November 13, the FRBNY (b) failed to send notice down the collection chain of the check's delay in transit, as required by UCC § 4–202(1)(e); (c) failed timely to forward the check for presentment to the FRBC, as required by UCC § 4–202(1)(a)[8]; and (d)

---

**6.** Detroit lies in the geographic district served by the FRBC. The FRBNY is permitted further to route the check to Chicago by virtue of note 3 to 12 C.F.R. § 210.6 (1979), currently codified at 12 C.F.R. § 210.6(a)(2) (1983) with minor stylistic variations. It allows a Federal Reserve Bank to route a check based on any addressing symbol, whether or not it be consistent with other symbols on the item.

**7.** The relevant portion of the statute reads:

§ 4–212. Right of Charge-Back or Refund

(1) If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge-back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the items if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts. These rights to revoke, charge-back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final

(subsection (3) of Section 4–211 and subsections (2) and (3) of Section 4–213).

**8.** The provision reads, in part:

§ 4–202. Responsibility for Collection: When Action Seasonable

(1) A collecting bank must use ordinary care in

(a) presenting an item or sending it for presentment; and

(b) sending notice of dishonor or non-payment or returning an item or other than a documentary draft to the bank's transferor or directly to the depositary bank under subsection (2) of Section 4–212 after learning that the item has not been paid or accepted, as the case may be; and

(c) settling for an item when the bank receives final settlement; and

(d) making or providing for any necessary protest; and

(e) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

(2) A collecting bank taking proper action before its midnight deadline following receipt of an item, notice or payment acts seasonably; taking proper action within a reasonably longer time may be seasonable but the bank has the burden of so establishing.

failed to send notice of non-payment down the collection chain, as required by UCC § 4-202(1)(b). *See* Plaintiff's Brief at 4-5; Transcript of Hearing of June 17, 1983 [Tr.] at 7-9.[9]

## I

■ At the outset the parties have vigorously disputed whether the FRBNY is a "collecting bank" for purposes of UCC §§ 4-212 and 4-202 because the strictures of those sections apply only to such banks. Defendant argues, *see* Defendant's Reply Memorandum at 1-3, that it cannot be a collecting bank because they are defined as "any bank handling the item *for collection* except the payor bank," UCC § 4-105(d) (emphasis added), and it had no authority to handle the check "for collection," as it was not drawn on a bank located in the geographic district served by the FRBNY. For the latter proposition the FRBNY refers us to 12 U.S.C. § 360 and 5 *Fed.Res.Bull.* 467 (1919) (Exhibit F to Defendant's Reply Memorandum). This argument is without merit. The purpose of the Federal Reserve Act of 1913, as amended [10]—whose section 16 is the forerunner of what is now 12 U.S.C. § 360—was to organize the Federal Reserve Bank. There is not the slightest indication that the grant of authority in § 360 was intended as a shield against the application of UCC §§ 4-212 and 4-202 or, conversely, that the drafters of the UCC intended those sections to be read in conjunction with 12 U.S.C. § 360. Section 4-105(d) of the UCC sets out a very practical, commonsensical definition of "collecting" bank as every bank in the collection chain except the payor bank. *See, e.g., Southern Cotton Oil Co. v. Merchants Nat. Bank* (5th Cir.1982) 670 F.2d 548; *Union Bank of Benton v. First Nat. Bank* (5th Cir.1980) 621 F.2d 790; *Engine Parts v. Citizens Bank* (1978) 92 N.M. 37, 582 P.2d 809; *Wilhelm Foods v. Nat. Bank of North America* (S.D.N.Y.1974) 382 F.Supp. 605; *Tubin v. Rabin* (N.D.Tex.1974) 382 F.Supp. 193. The FRBNY was certainly a link in that chain.[11]

Defendant argues further that it is not a collecting bank because it was sent the check by mistake. *See Citizens State Bank v. Martin* (1980) 227 Kan. 580, 609 P.2d 670, 676 (holding that a bank receiving a check because of a encoding error is not a collecting bank). The check, however, was not sent by mistake. It was properly addressed to the FRBNY in accordance with a MICR routing number which called for such destination. This was, of course, part of a fraudulent scheme but it surely was not a mistake.[12] Last, the FRBNY argues that it should not be subjected to UCC §§ 4-212 and 4-202 because "[p]laintiff should not be permitted to impose significant legal obligations on the New York Fed simply by sending it a worthless piece of paper." Defendant's Reply Memorandum at 3. This is yet another strained argument. The check is no less valuable than a check drawn on insufficient funds at an account with an in-district bank. The value of the check is of no consequence to

---

**9.** The complaint also includes a claim that the FRBNY improperly forwarded the check to the FRBC because it should have known something to have been amiss after receiving the check unpaid from Bankers Trust. *See* Complaint ¶ 23. This claim is not elaborated or pursued in plaintiff's opposition brief and, in any event, would not have been successful in light of note 3 to 12 C.F.R. § 210.6 (1979). *See* note 6, *above.* Accordingly, we have no occasion further to consider this "misrouting" claim, which claim we deem abandoned.

**10.** The statutory framework for the Federal Reserve System can now be found in 12 U.S.C. §§ 221 *et seq.*

**11.** The FRBNY's sophistic argument can be met on its own terms by a holding that the requirement that a check be "drawn" on an in-district bank is satisfied, for the limited purpose of characterizing the FRBNY as a "collecting" bank in this situation, if the check has a routing number belonging to a bank located in the district served by the FRBNY.

**12.** We have no occasion to consider whether a defendant ought to be considered a "collecting" bank with respect to an item it received truly by mistake—*e.g.*, mislaid in a mail bag addressed to it. In this case the check was delivered to the FRBNY entirely by design. To the extent the *Martin* case can be read as holding that the FRBNY is not a collecting bank in this situation we disagree with its conclusion.

the role which the FRBNY played in the collection process or to the attendant obligations to which it should, accordingly, be subjected. We therefore hold that, on the facts of this case, the FRBNY is a collecting bank for the purpose of subjecting it to such duties as are specified in UCC §§ 4–212 and 4–202.[13]

## II

Plaintiff contends that the FRBNY lost its right to charge back plaintiff's account under UCC § 4–212 when it failed, "by its midnight deadline" after receiving the check from the FRBC on November 29, to return it or to send notification of having received it unpaid.[14] We observe again that by November 29 any notification—by whatever means—would have been futile because the malefactor had completed his fraud on November 24. Accordingly, the question we are asked to decide is whether, in requiring "notification" or the "return" of the item, UCC § 4–212(1) establishes conditions precedent to the right of charge-back or whether it defines a duty of ordinary care relative to the right to charge-back. If it were the former, the non-occurrence of the condition would result in there being no right to charge-back—*i.e.,* the collecting bank who failed to fulfill the conditions would be absolutely liable for the item. If it were the latter, the right to charge-back would be absolute, at least until settlement became final, but a plaintiff could hold the collecting bank responsible for such damages as were proximately caused by the collecting bank's failure timely to discharge its duty to notify or to return the item. In this case, no damages could be traced by the FRBNY's alleged failure to notify on or after November 29, because the damage could not then have been prevented.

■ We hold that UCC § 4–212(1) establishes a duty of care, not a condition to the right to charge-back. At oral argument plaintiff's counsel conceded, *see* Tr. 23–27, that the only reported case which specifically addresses the question before us is *Appliance Buyers Credit Corp. v. Prospect Nat. Bank* (7th Cir.1983) 708 F.2d 290 (Timbers, C.J., of the 2d Cir. in the majority panel). It holds, as do we, that UCC § 4–212(1) imposes a duty, not a condition and that plaintiff, therefore, has the burden of establishing the actual damages caused by the collecting bank's failures. *Id.* at 294–95. We could safely rest our holding on the persuasive statutory exegesis in *Appliance*

---

**13.** Plaintiff also argued that the FRBNY—even if found not to be a collecting bank—should be held to the obligations specified in the UCC by virtue of principles of tort and agency law and on the strength of 12 C.F.R. § 210.6(a) (1979), now codified at 12 C.F.R. § 210.6(a)(1) (1983), which absolves the FRBNY of any liability except that which results from its own lack of good faith or failure to exercise ordinary care. In light of our ruling that the FRBNY is indeed a collecting bank, these grounds for liability are supernumerary, as the relevant provisions of the UCC set out the obligations of care applicable to a collecting bank. We have no occasion, therefore, further to consider those alternative arguments.

**14.** Defendant observes, *see* Defendant's Reply Memorandum at 13–14, that it could not possibly have charged back plaintiff's account because plaintiff does not have an account at the FRBNY. Quite plausibly the FRBNY contends that it charged back the account of its immediate link "down" the collection chain—the Dallas Fed—and that each subsequent collecting bank must have done likewise until, finally, plaintiff's account was charged back by the Republic National Bank of Dallas, plaintiff's correspondent bank for out-of-state collections. The FRBNY argues, therefore, that plaintiff's dispute concerning the charge-back is not with it, but with someone else and, therefore, that plaintiff lacks constitutional "standing" to bring this claim. The objection to plaintiff's claim, however, has nothing to do with the constitutional doctrine of standing. That doctrine addresses the qualifications of a plaintiff to bring a suit, not the "qualification" of a defendant to be the target of plaintiff's complaints. Defendant's real contention in this regard is not that the plaintiff has no standing to bring this claim, but that it is the "wrong" defendant because it did not "cause" plaintiff's harm. This objection is merely another ground for a motion to dismiss, not a basis to challenge the constitutionality of this claim. In light of our ruling, however, we need not address the question of causation which the foregoing argument raises. We deem the FRBNY's charge-back to have "caused" the appropriate debit on plaintiff's account with its immediate link in the collection chain.

**530**

*Buyers.* In addition, however, we observe that comment 1 to UCC § 4–108 specifically refers to UCC § 4–212 as "prescrib[ing] . . . time limits . . . within which a bank, in fulfillment of its obligation to exercise *ordinary care,* must handle items entrusted to it for collection . . ." (Emphasis added.) Moreover, we would not impute to the drafters of the UCC the intention of imposing a duty the performance of which would make no practical difference whatever. To be sure, the language of UCC § 4–212(1) is far from clear in this regard. Although clarity and consistency have never been the UCC's hallmark, *see, e.g.,* D. Mellinkoff *The Language of the Uniform Commercial Code,* 77 Yale L.J. 185 (1976), practicality is certainly one of its virtues. We would therefore require a clear indication of legislative intention before reading into UCC § 4–212(1) a collecting bank's obligation to perform an empty gesture. Plaintiff has called to our attention no such indication, nor has our own research uncovered any.[15]

The clearest expression of the purpose to be served by the notification requirement in the charge-back statute is provided by comments 1 and 4 to UCC § 4–207 (1950 Edition). Notification is intended, the comments tell us, promptly to advise an unsuspecting customer and to protect him from having checks (drawn on his account) returned unpaid. *See, e.g., First State Bank & Trust Co. v. George* (Tex.Civ.App.1974)

519 S.W.2d 198, 16 UCC Rep. 160. *See also* UCC § 4–212 comment 5. Even on the plausible assumption that the duty of prompt notification was also intended to allow the customer and a collecting bank to protect their rights against third parties, there is no logical reason to suppose that such intention implies that the violator of the duty be held liable, irrespective of the causal connection between the breach and the plaintiff's inability to collect on the item. *Cf.* UCC §§ 4–202 (duty) and 4–103(5) (measure of damages). Indeed, all decisions which we have been able to locate denying a defendant's right to charge-back under UCC § 4–212 for failure to notify (or to forward the item), are cases in which causation is established because the defendant's failure led to a detrimental change in plaintiff's position, which change could have been avoided by prompt notification. *See, e.g., Manufacturers Hanover Trust Co. v. Akpan* (Civ.Ct.1977) 91 Misc.2d 622, 398 N.Y.S.2d 477; *First Sec. Bank of Utah v. Ezra Lundahl, Inc.* (1969) 22 Utah 2d 433, 454 P.2d 886. *Cf. also State ex rel. Gabalac v. Firestone Bank* (1975) 46 Ohio App.2d 124, 346 N.E.2d 326, 329; *Benthall v. Washington Hog Market* (1962) 257 N.C. 748, 127 S.E.2d 507, 509. *But cf. Wells Fargo Bank v. Hartford Nat. Bank & Trust* (D.Conn.1980) 484 F.Supp. 817, 822–23.[16]

█ Accordingly, we hold the cause of action under UCC § 4–212 to be legally

---

**15.** The charge-back section can be traced at least back to the April and July 1948 Proposed Final Drafts Nos. 1 and 2 of Article III on commercial paper, which then included the subject of check collections. Its forerunners were then entitled "reversal of credit." *See* § 711 (Draft No. 1, April 15, 1948); § 715 (Draft No. 2, July 30, 1948). Neither those sections nor their "Notes and Comments" provide any clue that the present UCC § 4–212(1) should express a condition rather than a duty. *See also* Notes & Comments at 66 (Draft No. 1); Notes & Comments at 19–20 (Draft No. 2). In the 1948 version of the UCC the relevant section had already taken the title "right to charge back" and contained language to the effect that "[a collecting bank may charge back], but the collecting bank must make such charge back and return the item or send notice to its transferor by its midnight deadline." *See* UCC § 3–617(1) (1948 Edition). By 1950 it had

been renumbered § 4–207 and had also taken substantially its present language. In the Final Text Edition of 1951 it was renumbered § 4–212. These antecedents do not point to a finding that a "condition" is implied by the language of UCC § 4–212(1).

**16.** The only authorities cited by plaintiff in connection with the claim under UCC § 4–212 are *Manufacturers Hanover Trust Co. v. Akpan, supra,* and *Distributors, Inc. v. Bankers Trust Co.* (2d Dep't 1971) 36 A.D.2d 840, 321 N.Y. S.2d 428. The *Akpan* case is unpersuasive because—as indicated by the text, *above*—causality between the failure to notify and the subsequent loss was there established. The *Distributors* case is inapposite as it involved a situation where the right to charge-back was lost because the provisional credits had become final.

insufficient because plaintiff has pleaded no facts which establish that it is entitled to any damages, even if it prevailed on the issue of liability.

### III

Plaintiff also charges the FRBNY with violating UCC § 4–202(1)(e) because it did not send a notice of delay in transit after it received the check unpaid from Bankers Trust. Defendant FRBNY contends, on the other hand, that UCC § 4–202(1)(e) was not meant to apply to a situation such as this one, but rather to cases in which the physical items are lost or destroyed when transported from one location to another. *See Citizens State Bank v. Martin, supra,* 227 Kan. at 588, 609 P.2d at 676 (dictum).

In our view defendant's position is the correct one. The history of UCC § 4–202(1)(e) can be traced at least back to the Proposed Final Drafts Nos. 1 and 2 of Article III on commercial paper. The relevant section in Draft No. 1 was appropriately entitled "*Lost* Items," *see* § 715 (Draft No. 1, April 15, 1948) (emphasis added), and in Draft No. 2 it was called "*Loss* of Cash Items in Transit." *See* § 713 (Draft No. 2, July 30, 1948) (emphasis added). Their respective notes and comments leave no doubt that the "delays in transit" which the drafters contemplated were those occasioned by mishaps in the mails. *See* Notes and Comments to Draft No. 1 at 71 (April 15, 1948); Notes & Comments to Draft No. 2 at 17 (August 2, 1948). *See also* UCC § 3–611(2) (1948 Edition). We have found nothing in the subsequent legislative history to persuade us that the several stylistic mutations which eventually led to UCC § 4–202(1)(e) modified the above described legislative intent. *See also* N.Y.Law Revision Comm., *Study of Unif.Com.Code—Article 4* at 97 (Leg.Doc. No. 65(E), 1955).

■ In this case the physical progress of the fraudulent check was never hindered by an accident, *cf. Girard Trust Bank v. Brinks, Inc.* (1966) 422 Pa. 48, 220 A.2d 827, or by it being mislaid in the mail. Accordingly, we hold that the FRBNY was under no obligation to give such notice as is specified in UCC § 4–202(1)(e).

### IV

■ Plaintiff also contends that the FRBNY violated its duties under UCC § 4–202(1)(a) because it failed to forward the check to the FRBC within the time limits specified in UCC § 4–202(2) after having received it unpaid from Bankers Trust. *See* Plaintiff's Memorandum at 12–13; Tr. at 8. This claim, for the time being at least, we must sustain.

In connection with a claim under UCC § 4–202 there is no dispute that the appropriate rule for damages is the "but for" test of UCC § 4–103(5).[17] *See Marcoux v. VanWyk* (8th Cir.1978) 572 F.2d 651, 653; *Wilhelm Foods, Inc. v. National Bank of North America* (S.D.N.Y.1974) 388 F.Supp. 1376, 1380–81; *United Kentucky Bank v. Eagle Machine Co.* (Ky.Ct.App.1983) 644 S.W.2d 649, 35 UCC Rep. 564; *Wertling v. Manufacturers Hanover Trust Co.* (Civ.Ct. 1983) 118 Misc.2d 722, 461 N.Y.S.2d 157, 160–61; *Hoffower v. Pennsylvania Exchange Bank* (4th Dep't 1962) 16 A.D.2d 1032, 229 N.Y.S.2d 979, 980; 6 Reitman Banking Law § 134.08 at 38–40 (1981) (citing cases). Moreover, this measure of damages for the violation of the duty of care in handling items for collection long antecedes the enactment of the UCC. *See American Nat'l Bank v. Bank of Bandon* (9th Cir. 1917) 240 F. 624; *Balsa Ecuador Lumber Corp. v. Security Nat. Bank* (E.D.N.C.1956) 141 F.Supp. 470, 476; UCC § 4–103 comment 6. With the foregoing in mind it is apparent that, even if it were able to establish that the FRBNY violated UCC § 4–202(1)(a), plaintiff would be hard pressed to prove damages. It is equally clear, how-

---

**17.** The provision reads:

§ 4–103

\* \* \* \* \* \*

(5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care ...

**532**

ever, that in this procedural posture the claim may not be dismissed.

Defendant FRBNY has submitted an elaborate set of charts purporting to demonstrate that—given the benchmarks of November 13 and 20 when the check is known to have been in the hands of Bankers Trust and the FRBC respectively—the very task of physically transporting the check to Chicago compels the conclusions, first, that the FRBNY could not have violated UCC § 4–202(1)(a); and, second, that—if liability could be established—any possible delay must have been so short that it could not support damages because, even in the absence of such short delay, plaintiff could not have been notified in time to prevent the November 24 withdrawal. *See* Defendant's Exhibit 6; Defendant's Reply Memorandum at 3–7. Defendant's presentation is cogent, but inappropriate on a motion to dismiss. On the question of liability the FRBNY's argument is flawed in that it assumed, for instance, that Bankers Trust returned the bogus check just before its midnight deadline on November 14.[18] However, the event which starts the clock of UCC § 4–202(2) for the FRBNY is not the end of the period in which Bankers Trust *might* have lawfully acted, but the moment when it, *in fact,* returned the check to the FRBNY. On this complaint and in the absence of any discovery on that issue, *see* Tr. at 4, 7–8, we must allow for the possibility—unrealistic as it may be—that Bankers Trust may have returned the check before 2:00 P.M., *see* UCC § 4–107, on the

same day it received it—November 13. Therefore, we cannot say as a matter of law that the complaint rules out a violation of UCC § 4–202 by the FRBNY.

On the issue of damages, defendant's argument amounts, in substance, to the contention that the FRBC would have taken nine days to return the check to New York whether or not the FRBNY had forwarded it in time and, therefore, that—given any plausible delay—it would have been impossible to notify plaintiff in time to prevent the November 24 withdrawal. Although we are taken by the argument that the timing of events in Chicago is independent of the precise date on which the check arrived from New York, we are not prepared—on this record—to say so as a matter of law.

Accordingly, plaintiff will be allowed discovery for purposes of establishing the timing of the various stages by which the check progressed from New York to Chicago. Should the evidence prove that the FRBNY violated UCC § 4–202(1)(a) by delaying the check's progress beyond the limits specified in UCC § 4–202(2), plaintiff will be allowed—indeed, required—further to establish that such delay caused it damage.

**V**

 Finally, plaintiff charges that the FRBNY violated UCC § 4–202(1)(b) by failing to send a notice of non-payment after it had received the check from Bankers Trust

18. To support its assumptions about the timing of Bankers Trust's actions, defendant cleverly fastens on the fact that the complaint also includes a claim against Bankers Trust on an allegation that it delayed the return of the check to the FRBNY beyond its midnight deadline. The time span between November 13 and 20 being, of course, fixed, it follows logically that the shorter the time which the check remained in the hands of Bankers Trust, the longer it necessarily must have been in the possession of the FRBNY. Accordingly, the FRBNY contends that, by assuming *arguendo* that Bankers Trust acted by its midnight deadline—an assumption contradicted by the very allegation against Bankers Trust—it vouchsafes plaintiff the "most favorable" construction of the complaint. This "generosity" is misleading

since it amounts to no more than a disclaimer of liability on grounds that the complaint is drafted in the alternative. There having been no discovery on precisely what happened to the check between November 13 and 20, we are, of course, in no position to express a view as to whether the FRBNY, Bankers Trust, both, or neither violated UCC § 4–202 in their handling of the check. What we may certainly not do is allow the FRBNY to defeat the complaint by making assumptions that are unsupported by the record and are based solely on inferences drawn from the fact that the complaint is understandably—in light of the absence of discovery—drafted in the alternative. *See* Fed.R. Civ.P. 8(e)(2) (allowing inconsistent or alternative pleadings).

some time after November 13.[19] On the other hand, defendant contends, in substance, that UCC § 4–202(1)(b) does not impose on it the duty to notify about Bankers Trust's non-payment because the drafters of the UCC intended the "notice of dishonor or non-payment" mentioned in UCC § 4–202(1)(b) to originate with the payor bank; and that, accordingly, the FRBNY was not legally obligated to send the appropriate notice until it received it from Chicago.[20] See Defendant's Memorandum at 8–9; Defendant's Reply Memorandum at 7–9. We disagree.

The parties' submissions in this regard have amounted to no more than exchanges of unsupported conclusions. Such (necessarily incomplete) review of the UCC's sprawling legislative history as we were able to perform allows us to state that the drafters of the UCC certainly *expected* that the last bank in the collection chain would be the wellhead of the notification stream down that chain, such expectation being part of generally shared institutional assumptions. A review of the mutations of UCC § 4–202—going back to § 712(1) and § 708(1), both entitled "Responsibility for Collection," of the 1948 Proposed Final Drafts Nos. 1 and 2 of Article III, respectively—shows, however, no evidence whatever of an *affirmative legislative intention* in this connection.[21] There is, in fact, no indication that any thought was given to the situation before us in this case. This is, of course, not at all surprising. The 1981 edition of a respected treatise on the law of check collections does not even mention

"MICR fraud"—as this fraud has, appropriately, come to be known—in its sections dealing either with fraud or with the responsibility for losses due to improper encoding. See B. Clarke, The Law of Bank Deposits, Collections & Credit Cards chs. 6 and 10 (rev.ed. 1981). Indeed, the legal problems of loss due to improper encoding, let alone fraud, are of relatively recent vintage. See, e.g., Georgia Railroad Bank & Trust v. First Nat. Bank (1976) 139 Ga.App. 683, 229 S.E.2d 482 (calling itself a case of first impression) (underencoding); State ex rel. Gabalac v. Firestone Bank (1975) 46 Ohio App.2d 124, 346 N.E.2d 326 (overencoding). What we have, therefore, is a statute, UCC § 4–202(1)(b), which—on the basis of the parties' submissions and our own research—cannot fairly be said to have been drafted in contemplation of the facts in this case. The question, then, is whether it should be interpreted to cover the situation at hand. We think it should.

Certain observations are in order concerning Article IV in general and UCC § 4–202 in particular. The history of the UCC makes it abundantly clear that, especially in the context of those provisions which impose a duty of care, the Code's watchword is "flexibility." It is well known that banks' early opposition to what is now Article IV could be traced in considerable measure to the fear that the possibility of any conduct not complying with procedures affirmatively approved would be found to constitute a violation of the obligation of care. See, generally, W. Malcolm, *Article 4—A Battle with Complexity*, 1952 Wisc.L.

---

**19.** We need not resolve the parties' disagreements on whether Bankers Trust's return of the check technically constituted its "dishonor." See UCC § 3–507.

**20.** It was observed at oral argument that in this case—the "Bank of Detroit" being a fictitious institution—there was *no* payor bank in the collection chain. As we have already pointed out, we do not regard the fact that the "Bank of Detroit" does not exist as determinative. See note 4, *above.* In any event, our ruling on the applicability of UCC § 4–202(1)(b) does not turn on the existence (or non-existence) of a payor bank. We can, thus, take defendant's position in this case to be that the "notice of

dishonor or non-payment" was intended to originate with the "last" bank in the collection chain and that the FRBNY was entitled to suppose that bank to be in the Chicago district.

**21.** Defendant's only feeble attempt to "prove" his argument consists of a naked reference to UCC § 4–301(1)(b) and the observation that it uses the same language as does UCC § 4–202(1)(b)—"notice of dishonor or non-payment"—in describing what a *payor* bank must send "down" the collection chain in order to revoke a settlement. Such observation is entirely consistent with our view but falls well short of proving the assertion of legislative intent on which the FRBNY relies.

Rev. 265, 280–83 (1952). The Final Text Edition of 1951 crystallized UCC § 4–103(3) and § 4–103(4) which clearly established that approval of certain procedures did not constitute disapproval of other procedures found reasonable in light of sound banking practice. *See also* UCC § 4–103 comment 5. This observation leads to two conclusions. First, there being no mechanical test for what constitutes ordinary care in a novel situation, the ultimate standard is dictated by the imperatives of *sound banking practice*, seasoned by the obligation of good faith. *See* UCC § 1–201(19).[22] Second, flexibility is a two way street: just as a new task or procedure will certainly be acceptable if it reflects sound banking practice, so the lack of one—when such absence violates sound banking practice—should be actionable.

Concerning UCC § 4–202 in particular, there are strong indications that the tasks described in UCC § 4–202(1)(a) through (e) are not an exhaustive list of the actions to be taken by a collecting bank in order to satisfy its obligation of ordinary care. *See* UCC § 4–202 comment 1 (the section described "basic" responsibilities); comment 3 (the section describes "types" of "basic" actions); comment 4 ("ordinary care" is used

in its "normal tort meaning" and "[n]o attempt is made . . . to define *in toto* what constitutes ordinary care of lack of it"). This leads to the further conclusion that the enumeration in UCC § 4–202(1)(a) through (e) should not be deemed—by negative implication—a bar to the reinterpretation (or expansion) of the duties owed by a bank in discharging its collection function with ordinary care.

With the foregoing in mind the specific question before us is: What should be considered good banking practice in a situation where it comes to a banker's attention that the routing code on a check is inconsistent with the address on the face of the item? If day-to-day banking experience should demonstrate that such inconsistencies are usually the result of simple error, there would be no reason to assume that a conscientious banker should become alarmed at learning of an inconsistency or deem it his duty to notify anyone.[23] On the other hand, if day-to-day banking experience should establish that such inconsistencies are usually an indication of fraud[24], then it might well be argued that a collecting bank, in satisfying its obligation of ordinary care, should take steps promptly to

**22.** The same lesson can be learned when tracing the vicissitudes of what eventually became the standard of "ordinary care" in the Final Text Edition of 1951. Earlier a myriad of formulations had been attempted: § 731(1) of the 1948 Draft uses "proper handling"; the 1949 Edition of the UCC variously used terms like "diligence," § 3–614(2), "[lack of] negligence," § 3–614(3), "improper handling," § 3–616 and § 3–617(2); in the 1950 draft "improper handling" was again used, § 4–306, as was "diligence," § 4–312, and "negligence," § 4–103; the Spring 1951 draft even attempted a definition of "improper handling," § 4–103(2), and added "carelessness" to the repertoire, § 4–103(1)(a). Eventually, this process was abandoned in the 1951 Final Text Edition in favor of the pragmatic language of the A.B.A. Collection Code—"failure to exercise ordinary care"—which was thereafter consistently used. And in the A.B.A. Code it is sound banking practice which, ultimately, defines what is "ordinary care." *See also* N.Y.Law Revision Comm., *Study of Unif.Com.Code Article 4* at 92 (Leg. Doc. No. 65(E), 1955).

**23.** The existence of footnote 3 to 12 C.F.R. § 210.6(a) (1979), currently codified at 12

C.F.R. § 210.6(a)(2) (1983), may well be persuasive evidence that this is, in fact, the actual state of affairs. This provision absolves the Federal Reserve from liability for *routing* an item according to *any* addressing symbol that may appear on it. Although the parties have submitted nothing to clarify the background of this regulation, its very existence may indicate that inconsistencies in routing symbols are often to be found, without thereby suggesting the possibility of fraud. We observe, moreover, that footnote 3 has—in our view—no other direct bearing on the FRBNY's obligation to *notify*. On its face that footnote appears to deal only with the potential claims that may be raised under UCC § 4–204 which prescribes due care in *routing* an item.

**24.** This form of fraud is not nearly as uncommon as defendant seems to suggest. At oral argument it developed that there is an aggregate of some $2 million of such fraud in the early stages of litigation. Tr. at 45–46. In the last few months we have had before us a criminal case involving precisely this scheme.

notify a prospective victim in the collection chain.[25]

If there is a policy implicit in the UCC's rules for the allocation of losses due to fraud, it surely is that the loss be placed on the party in the best position to prevent it. *See* B. Clarke, The Law of Bank Deposits, Collections & Credit Cards, ¶ 6.1 (1981).[26] At oral argument we suggested that plaintiff should be made to bear—on policy grounds—full responsibility for this loss. It is, after all, a bank's business to make certain that it doesn't deal with crooks.[27] On further reflection, however, we are not prepared to say that no share[28] of the loss should be placed—on policy grounds—on a collecting bank which might be shown to have known (or to be on notice) that fraud was afoot and did nothing to stop it, although it had the "last clear chance" to do so. However, on the record before us no facts are pleaded—let alone proved—which would shed any light on whether inconsistency between the routing code and the address on the face of the item could reasonably be regarded as a mere mistake or should alert any knowledgeable banker to the probability of fraud.

## CONCLUSION

The claims based on UCC §§ 4–202(1)(a) and 4–202(1)(b) are, accordingly, held to be legally viable. The plaintiff may, if it be so advised, amend its complaint to allege facts suggesting that routing code inconsistency should be regarded as indicating the probability of fraud; and may conduct appropriate discovery on that issue. The remaining claims against the FRBNY are dismissed for failure to state a cause of action.

A conference will be held on Thursday, October 27, 1983 at 9:30 A.M. in Courtroom

---

25. Defendant argues that if it were required to do so—in the absence of notification from a payor bank—it might be liable to an innocent drawer for misrepresentation or liable if the items later turned out to be properly payable. Defendant's Memorandum at 9. This argument is frivolous: all a collecting bank would be required to do is to tell the truth; namely, that there is an inconsistency in routing symbols and that the item, pursuant to 12 C.F.R. § 210.6(a)(2) (1983), is being forwarded elsewhere for further attempts at collection. It would be up to the depository bank to draw its own inference in light of its experience with the customer involved. Moreover, the requirement of notification would place no undue burden on the collecting bank. All that would be required would be routine instructions that such disparity be automatically referred to a given individual whose automatic duty it would be to notify the depository bank.

26. This policy can be illustrated by the well-known rule that the loss falls on a forger's immediate transferee. *See* UCC §§ 3–417(2)(a), 4–207(2)(a), 3–414(1), and 4–212(1). Even the exceptions to the rule further illustrate that policy. For example, the so-called rule of *Price v. Neal* establishes that a drawee bank paying over a forged signature (not endorsement) bears the risk of loss, on the assumption, *see* UCC § 3–417 comment 3, that it could have verified the genuineness of its client's signature. *See* UCC §§ 3–418, 3–417(1)(b), and 4–207(1)(b) (collectively denying recovery against innocent payee); §§ 3–401(1) and 3–404(1) (denying recovery against client). *See also* UCC § 3–406 (exception to the rule of *Price v. Neal* when a drawer's fault contributes to loss); UCC § 3–405(1)(b) and (c) (rule of the "fictitious payee"); UCC § 3–405 comment 4.

27. Plaintiff's counsel seemed at a loss to suggest what, precisely, his client could have done to prevent this scheme. It could, of course, have placed a longer "hold" on the availability of funds; we know of no Texas or federal statute requiring that funds from transit items be available to clients in 14 days. *See Wertling v. Manufacturers Hanover Trust Co., supra,* 118 Misc.2d 722, 461 N.Y.S.2d at 160. *But cf.* Ch. 234, Section 1, 1983 N.Y.Laws 438 (McKinney) (to be codified at N.Y. Banking Law § 14–d) (allowing the banking board to prescribe "reasonable" time period for the availability of proceeds from items deposited for collection). The question, however, is not what plaintiff could have done in *this* case but who (in the collection chain) is, generally, in the *best* position to prevent the fraud. He who deals with a malefactor must certainly be charged with the responsibility of discovering the fraud—nobody else in the collection chain can do better. As a matter of policy, moreover, the depository bank is in the best position to distribute the risk over its client base through insurance. *See, generally,* E.A. Farnsworth, *Insurance Against Check Forgery,* 60 Colum.L. Rev. 284, 302–03 (1960).

28. The recovery rules of the UCC are "all-or-nothing" schemes and they do not appear, insofar as we are aware, to sanction the notion of "comparative" fault. But neither does the UCC explicitly disavow it. *See* UCC § 1–103.

619 to discuss the further progress of this litigation.

SO ORDERED.