UNITED STATES FIDELITY AND
GUARANTY COMPANY and Union
Trust Company of Maryland, Plaintiffs,

v.

The FEDERAL RESERVE BANK OF
NEW YORK, Defendant.

No. 83 Civ. 3310–CSH.

United States District Court,
S.D. New York.

May 16, 1984.

488

Duer & Taylor, New York City, for plaintiff; Frank C. McLaughlin, Jr., New York City, of counsel.

Thomas C. Baxter, Jr., New York City, for defendant.

MEMORANDUM OPINION
AND ORDER

HAIGHT, District Judge:

Plaintiff Union Trust Company of Maryland ("Union Trust") is the victim of a cleverly executed check fraud.[1] Claiming that the Federal Reserve Bank of New York ("New York Fed") is at least partially responsible for the success of the scheme, it seeks to hold New York Fed liable for

---

1. Plaintiff United States Fidelity and Guaranty Company is Union Trust's insurer. Union Trust and its insurer shared the loss sued upon.

the loss. Defendant moves to dismiss the action for failure to state a claim under Rule 12(b)(6), Fed.R.Civ.P.[2]

## I.

On May 6, 1980, one Marvin Goldstein, the perpetrator of the fraud, deposited a check for some $880,000 in a Union Trust account. In hindsight, it is obvious that the check was designed to defraud the bank, for its counterfeit numerals served to turn the mechanized efficiency of the banking system against itself. Explaining its success will require a digression into modern techniques of check processing.[3]

It is common experience that banks "hold" checks deposited for collection for a short period of time after deposit. For that period of time the banks grant only a provisional credit in the depositor's account and do not allow withdrawals of funds against the deposited checks. The purpose of the hold is to permit the depository bank to assure itself that there are sufficient funds in the account on which the check is drawn to permit its payment. Because of the tremendous volume of checks routed through the processing system, however, it is impractical for payor banks, those which hold the account on which the check is drawn, affirmatively to notify depository banks that a particular check has been paid. Instead, actual notice is given only in the event of nonpayment. As a result, depository banks hold a check until a sufficient amount of time passes for notice of nonpayment, if sent, to have reached them. If no notice is received within this time, the check is assumed to have cleared, the provisional credit becomes final and the depositor is permitted to withdraw funds against the check. One sees here an application of the maxim: "No news is good news."

Quite clearly, time is of the essence. If a check is delayed for a long enough time during its route from the depository to the payor bank, the check may not reach the payor bank for approval before the depository bank, assuming payment, permits funds to be withdrawn against it. As an aid in preventing such occurrences, banks in the chain of transmission are ordinarily required, under the "midnight deadline" rule, to process a check roughly within a day of receipt. See, e.g., N.Y.U.C.C. §§ 4–202(2) and 4–302(a).[4] A bank which fails to meet its midnight deadline becomes liable for damages resulting from the delay. Ordinarily, then, any delay in the processing of a check which causes a depository bank prematurely to assume clearance

**2.** Plaintiffs cross-move to correct by amendment deficiencies in their complaint which were pointed up by defendant's moving papers. Since New York Fed argues no prejudice from the amendments and leave to amend this early in the proceedings is to be "freely given," Fed.R. Civ.P. 15(a); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962), I grant the motion to amend and will judge the sufficiency of plaintiffs' claims on the basis of the amended complaint.

The two deficiencies concerned subject matter jurisdiction and plaintiff Union Trust's status as a "sender" for the purposes of 12 C.F.R. § 210.-2(e) (1979). Suits against Federal Reserve Banks are deemed by statute to fall within federal question jurisdiction, as alleged in the amended complaint. 12 U.S.C. § 632. The amended complaint also alleges that Union Trust is a member of the Federal Reserve system, thus qualifying it as a "sender" under 12 C.F.R. § 210.2(e) (1979). Fidelity and Guaranty's status was not challenged.

**3.** A thoroughly-documented and more detailed presentation of the following brief description of check-processing can be found in Judge

Knapp's recent opinion in *Northpark National Bank v. Bankers Trust Co.,* 572 F.Supp. 524, 525–526 (S.D.N.Y.1983).

**4.** New York Fed has argued that federal common law should apply in this action, which law it suggests is embodied by the Permanent Editorial Board's edition of the *U.C.C.* supplemented by applicable federal statutes and regulations. The Board's version of the U.C.C., however, refers courts in suits such as this to the law of the state in which the defendant bank is situated. 2A U.L.A.U.C.C. § 4–102(2) (West 1968). New York state law contains an identical provision. N.Y.U.C.C. § 4–102(2) (McKinney 1964). It appears, then, that New York's version of the U.C.C. is the proper one to use, supplemented, as required by the Supremacy Clause, by applicable federal statutes and regulations.

In any event, neither side has pointed to a significant difference between New York state law and any other conceivably applicable body of law, making it unnecessary to look any further than the law of the forum state.

can be attributed to delay at one bank in the chain of transmission, and the dilatory bank becomes liable.

Compliance with the midnight deadline rule is aided by automated sorting. A number which identifies the payor bank, known as the Magnetic Ink Character Recognition number ("MICR number"), is printed in magnetic ink along the bottom of the check. At each bank a machine is able to read this number and automatically route the check toward the next appropriate bank in the collection chain. An expanded form of this number, referred to as the Routing Number, is repeated in ordinary numerals in the upper right-hand corner of every check. *See* further, *American Bankers Association Key to Routing Numbers* (Rand McNally, 1980), at K4–K6; *Bank Leumi Trust Co. v. Bally's Park Place, Inc.*, 528 F.Supp. 349, 350–351 (S.D. N.Y.1981).

With this background in mind, it is possible to detail the fraud at hand. On the face of the check Goldstein deposited at Union Trust were specified not one but two payor banks. The name of one payor bank, First Pennsylvania Bank of Philadelphia ("First Penn") was printed in letters in the lower left-hand corner of the check. The other payor bank, the State Bank of Albany ("Albany State"), was not specified by name; rather, it was specified by the Routing Number printed in the upper right-hand corner. Although this number ordinarily

corresponds to the MICR number along the bottom of the check, the MICR number of this check was effectively nonsense in that it identified no known bank. In any event, the check bore two inconsistent destinations. The result of this, as is described in more detail below, was that the check was routed through five banks over the course of nearly two weeks. Although every bank handling the check met its midnight deadline, ten days expired before the Union Trust was notified that neither Albany State nor First Penn would honor the check. The day before, however, Union Trust, having taken the silence as an indication that the check had been paid, had permitted Goldstein to withdraw $755,000 against the check. Because his remaining balance amounted to only about $1,000.00, Union Trust was out $754,035.00. Its insurer absorbed all but $100,000 of this loss.

To understand the alleged basis for liability of the New York Fed, it is necessary to trace the check on its ten day travels across the Northeast. On the day of deposit, May 6, 1980, Union Trust forwarded the check for collection to Philadelphia National Bank ("PNB"), a Pennsylvania bank which must not be confused with the previously-mentioned First Penn.[5] PNB apparently selected Albany State as the correct payor bank[6] and routed the check to New York Fed on May 7 in anticipation of its being forwarded by New York Fed to Albany State for collection.[7] New York Fed did

---

**5.** Although the parties do not so state, the check was apparently forwarded to PNB because PNB was Union Trust's "correspondent bank"—the bank to which Union Trust sent all of its out-of-state checks for collection. The circumstances surrounding this initial forwarding are currently unknown. Apparently the check was not machine processed since the MICR number specifies no known bank, making machine processing impossible. It is likely, then, that the check was read by hand and forwarded to PNB on the basis of either the Routing Number of Albany State or the written indication of First Penn.

**6.** This is not a surprising choice, since the routing numbers, which identified Albany State, are used to speed hand processing as well as to facilitate machine processing.

**7.** The Federal Reserve system consists of twelve Reserve banks, among them the New York Fed,

situated in twelve geographical and administrative districts. Banks within the district become members of the system by buying stock in the Reserve bank of their district. *See* B.H. Beckhart, *Federal Reserve System* 29–30, 44–45 (1972) (hereafter "Beckhart"). The member banks generally maintain deposits at their Reserve bank, which along with the member banks' cash on hand constitute the "reserves" which banks are required by law to set aside. *Id.* at 53–54. The member banks' deposits serve in addition to facilitate their many transactions with the Reserve bank. *Id.*

Among the major services provided by the Reserve banks is the handling of out-of-state checks. Before the creation of the Reserve System, collection of out-of-state checks was a cumbersome process. In order to avoid the levy of exchange charges, checks were routed in "a highly circuitous fashion" and took "an inordi-

forward the check, but Albany State returned it on May 9 stamped "Sent in Error." Intending either that the check be returned to PNB as dishonored or that it be forwarded to First Penn for collection, New York Fed sent the check on May 12 to the Federal Reserve Bank of Philadelphia ("Philadelphia Fed").[8] The Philadelphia Fed apparently selected the latter course and forwarded the check to First Penn on May 14. Early on May 16, First Penn, apparently having located no account on which the check could be drawn, notified PNB by telephone of the dishonor. PNB promptly passed the word to Union Trust, but the notice came too late to prevent the bank's loss.

Union Trust claims that in its handling of the check New York Fed breached its UCC-imposed duty to "use ordinary care in sending notice of dishonor or non-payment or returning an item ... after learning that the item has not been paid or accepted." N.Y.U.C.C. § 4–202(1)(a) and (b) (McKinney 1964). Plaintiff contends that New York Fed failed to exercise ordinary care by 1) failing to notify it of Albany State's return of the check, 2) sending the check to Philadelphia Fed rather than PNB, 3) failing to notify it of the delay caused by the routing to Albany State, and 4) failing to "wire advice" of Albany State's nonpayment. Any one of these actions would likely have prevented Union Trust's loss. New York

Fed challenges each of these claims individually. It also asserts the defense of statute of limitations[9] and argues that public policy and Federal Reserve regulations bar suits such as this.

## II.

N.Y.U.C.C. § 4–202(1) requires a bank in the collection chain, such as New York Fed, to "use ordinary care in the exercise of its basic collections tasks.... If [the bank] forwards the item to be presented [§ 4–202(1)] requires ordinary care with respect to routing ... and also in the selection of intermediary banks or other agents." Official Comments 1. & 2., N.Y.U.C.C. § 4–202 (McKinney 1964).[10] *See also* N.Y.U.C.C. § 4–103(1) (McKinney 1964) (duty of ordinary care may not be waived). The phrase "ordinary care" in Article 4 of the U.C.C. is not intended to refer to a standard of care unique to the banking world. Instead, it is "used with its normal tort meaning." Official Comment 4., N.Y.U.C.C. § 4–103 (McKinney 1964). Nor is it exhaustively defined by the Code, although "action or non-action approved by [Article 4] or pursuant to Federal Reserve regulations or operating letters constitutes the exercise of ordinary care." *Id.* As a consequence, in the absence of compliance with an applicable rule of law established by the U.C.C. or the Federal Reserve, ordi-

nately long time" to clear. Beckhart, *supra* at 68. The institution of the Reserve system provided banks with a speedy, dependable means for collection of such checks: member banks forwarded out-of-state checks directly to their Reserve bank, which sent them directly to drawee banks within the district or to appropriate Reserve Banks outside the district. In order to speed the processing of checks drawn on banks outside the forwarding banks's Reserve district, member banks were given permission, by regulation, to forward checks directly to the Reserve bank of the district in which the drawee bank was located, thus avoiding pointless routing of the check through the forwarding bank's own Reserve bank. 12 C.F.R. § 210.4 (1983). This is the general practice of large commercial banks such as PNB. Beckhart, *supra* at 69. Thus, PNB sent the check directly to Albany State's Reserve Bank, New York Fed, bypassing its own Reserve bank in Philadelphia.

8. Because a week-end intervened, the lapse of time from May 9 to May 12 did not exceed the New York Fed's midnight deadline.

9. In its moving papers New York Fed pointed out two defects in Union Trust's original pleading. These have been corrected. See *supra* note 2. It also argued in reply that it was not a "collecting bank" as defined in N.Y.U.C.C. § 4–105(d) and thus not subject to the duties imposed by U.C.C. § 4–202. This argument was properly rejected by Judge Knapp in *Northpark* as "sophistic," 572 F.Supp. at 528 n. 11, and defendant has withdrawn it.

10. New York Fed has abandoned the argument that it was not a collecting bank. See *supra*, note 9. Federal Reserve regulations recognize by implication that the New York Fed is subject to this duty of ordinary care. 12 C.F.R. § 210.-6(a) (1979).

nary care must be determined from all the surrounding facts and circumstances. *Cf. Wilhelm Foods, Inc. v. National Bank of North America*, 388 F.Supp. 1376, 1379 (S.D.N.Y.1974). If a U.C.C. or Federal Reserve regulation is applicable, however, it provides a safe harbor, and a bank may conclusively demonstrate ordinary care by proving compliance with it.

## III.

■ Plaintiffs first contend that in handling the check New York Fed failed to follow one of its own regulations governing handling of returned checks. Since the particular regulation is paragraph 20 of Federal Reserve Bank of New York Operating Circular No. 4, as revised September 18, 1979,[11] the claim sounds in breach of contract rather than tort, for Operating Circulars are treated as contracts binding on parties having an interest in items handled by the Reserve Bank in question. N.Y.U.C.C. §§ 4–103(1) and 4–103(2).

Paragraph 20 of Operating Circular No. 4 is one of a group of four paragraphs collected under the heading "Uniform instructions regarding protest and advice of nonpayment." It reads in relevant part:

> 20. Except as provided in paragraph 21 hereof [a paragraph all agree to be irrelevant here], all Federal Reserve Banks will receive, handle, and forward cash items [such as checks] subject to the following uniform instructions regarding...wire advice of nonpayment...:...
>
> (c) WIRE ADVICE of nonpayment of any item of $2,500 or over...unless it bears on its face the legend, "DO NOT WIRE ADVICE OF NONPAYMENT," of a Federal Reserve Bank or of a preceding bank endorser....

> (d) DO NOT WIRE ADVICE of nonpayment of:...
>
> (ii) any item of $2,500 or over unless such advice is required by subparagraph (c).
>
> [footnote omitted].

Because the check in question was over $2,500, the relatively straightforward language of paragraph 20 would appear to have required the New York Fed to wire advice[12] of the check's nonpayment by Albany State.

New York Fed responds by pointing to paragraph 23 of the same operating circular, which is also included under the "Uniform instructions regarding protest and advice of nonpayment" heading. Paragraph 23 reads in relevant part:

> This Bank shall have no responsibility for determining whether any other bank has...(b) given any wire advice of nonpayment required under the provisions hereof, nor shall this Bank have any responsibility for giving wire advice of nonpayment unless a wire advice of nonpayment required hereunder is received from the paying bank or any other bank.

New York Fed argues that unless it received wire advice of nonpayment from Albany State, paragraph 23 absolves it of any duty to wire advice of nonpayment back down the collection chain. *See, e.g., Lufthansa German Airlines v. Bank of America National Trust and Savings Assoc.*, 478 F.Supp. 1195, 1197 (N.D.Cal.1979), *aff'd.*, 652 F.2d 835 (9th Cir.1981) (Federal Reserve Bank transmitted wire advice after receiving it). Because receipt of such wire advice by New York Fed has not been pleaded, defendant urges dismissal of this ground for recovery.

Although the duties imposed by the operating circular are by no means clear, I am

---

**11.** Operating circulars are issued by individual Federal Reserve Banks in order to implement various Federal Reserve System regulations. Although the circular at issue here has been superseded, it was still effective at the time of the events in question. It implemented 12 C.F.R. § 210, otherwise known as Regulation J, governing collection of checks. This operating circular will be referred to throughout as "Operating Circular No. 4," it being understood that this refers to the superseded circular in effect in 1980, not the currently-effective circular designated "No. 4."

**12.** "Wire advice of nonpayment" refers to the sending of notice of the fact of nonpayment by means of electronic communications to a bank down the collection stream.

constrained to agree with New York Fed. It is true, as plaintiffs point out, that the language of paragraph 20 is absolute in requiring wire advice. Because it expressly provides for the one exception of paragraph 21, and only one exception, it arguably includes by implication the checks otherwise excepted by paragraph 23. Indeed, this is a relatively strong argument in support of plaintiffs' position, but it is the only one. Several other factors persuade me to the contrary.

First, to read paragraph 20 as plaintiffs urge would entirely nullify paragraph 23. On the other hand, New York Fed's reading would give effect to both paragraphs: New York Fed would have a duty to wire advice either if it received wire advice of nonpayment or if the nonpayment originated with it. The familiar rule of contract construction that a contract should if possible be read so as to give effect to all of its terms holds true whether the contract is drafted by private parties or by a Federal Reserve Bank. New York Fed's reading permits this; plaintiffs' does not.

Second, other publications clarify the meaning of Operating Circular No. 4 and reinforce the impression that it intends to impose the duty of sending wire advice only when wire advice is received. Administrative Procedure No. 15 of the Bank Operations Conference of the New York Clearing House Association[13] states that "[e]ffective July 1, 1977 all Federal Reserve offices implemented a uniform procedure under which they will not provide advice of nonpayment for cash items in amounts of $2,500 or over...unless such advice of nonpayment has been received from the paying bank." From this I infer that the interpretation urged by the New York Fed was accepted by the local banking community. Nor were other New York Fed publications entirely silent on the issue. Operating Circular No. 4 expressly refers to Federal Reserve Bank of New York Operating Circular No. 6, as revised September 18, 1979,[14] as the complement of Operating Circular No. 4. No. 4, entitled "Collection of Cash Items," describes the duties of New York Fed in handling cash items while No. 6, entitled "Instructions to Collecting Banks and Paying Banks," describes the duties of collecting banks and paying banks when dealing with New York Fed in the handling of cash items. Operating Circular No. 6 contains paragraphs numbered 20 and 23 which are identical to those numbered 20 and 23 in Circular No. 4. Although this admittedly makes the two circulars somewhat confusing when read together, the inclusion of paragraphs 20 and 23 in No. 6 has two significant effects. First, it places the burden on collecting and paying banks to wire advice in the first instance, since in paragraph 20 the command to "WIRE ADVICE" is addressed to the collecting and paying banks rather than to New York Fed. In addition, including paragraph 23 in No. 6 has the effect of warning the paying and collecting banks that unless they wire advice to New York Fed it will not pass the advice back down the collection chain. Operating Circular No. 6 thus convinces me that New York Fed attempted to communicate to the banking community the policy it now urges, while the Clearing House publication mentioned above convinces me that the community understood the message.

Finally, practical policy supports the defendant's view. By requiring paying banks to wire advice, the Federal Reserve Banks place the burden for initiating wire advice of nonpayment on the bank in the chain which is first and most certain to recognize that the check will not be paid. The paying bank is at once the most convenient, most trustworthy, and earliest point in the collection chain at which to initiate advice of

---

13. Such rules have the status of an agreement between parties having any interest in items handled by New York banks. N.Y.U.C.C. § 4–103(2).

14. This operating circular, like No. 4 cited above, *supra* note 11, has also been superseded by an unrelated publication. Again, references to "Operating Circular No. 6" refer to the No. 6 effective in May, 1980.

nonpayment. It thus is the most appropriate.[15]

This claim is thus dismissed. I recognize, however, that no discovery has yet been conducted. Should discovery reveal that New York Fed did indeed receive wire advice of nonpayment, plaintiffs will be permitted to amend their complaint to conform to the implications of this evidence.

## IV.

■ The plaintiffs' second contention is that N.Y.U.C.C. § 4–202(1)(e) required New York Fed to notify Union Trust of the delay caused by the routing of the check through Albany State. This U.C.C. provision requires a bank to send notice of a "delay in transit." Defendant argues that § 4–202(1)(e) refers to delays in passing a check from one bank to another rather than delays caused by complex routing.

Following a scholarly analysis of the legislative history of U.C.C. § 4–202(1)(e), Judge Knapp concluded in *Northpark National Bank v. Banker's Trust Co.*, 572 F.Supp. 524 (S.D.N.Y.1983) (hereafter *"Northpark"*), which involved a check fraud somewhat similar to that alleged here, that § 4–202(1)(e) was intended to apply only to delays occasioned by "mishaps in the mails," not to problems caused by misrouting. 572 F.Supp. at 531. *Cf. Girard Trust Bank v. Brinks, Inc.*, 422 Pa. 48, 220 A.2d 827 (1966). Plaintiffs argue, however, that Judge Knapp ignored a crucial amendment. Between the time of the 1948 Notes and Comments relied on by Judge Knapp and the 1964 enactment of N.Y.U.C.C. § 4–202(1)(e), plaintiffs point out, the drafting committee changed § 4–202(1)(e) from requiring notice of "loss or delay in transit" to notice of "any loss or delay in transit." Plaintiffs theorize that this addition expanded the scope of the subsection to include the delay at hand.

The phrase "delay in transit" does not clearly reach this situation. "Delay in transit" connotes some impediment to physical transportation of the item in question. Accepting that plaintiffs' interpretation is plausible, however, makes resort to the legislative history appropriate to resolve the uncertainty. Judge Knapp's research discloses that defendants' interpretation was indeed the intended meaning of the phrase. *Northpark, supra,* 572 F.Supp. at 531. Plaintiffs present no evidence that the addition of the word "any" was intended to change this meaning. The most likely explanation for the amendment is that it was intended to preclude judicial interpolation of some other adjective such as "material." In other words, the drafting committee probably intended to make clear that banks should provide notice of all delays in transit rather than only those delays which the banks or the courts adjudged significant. The word itself gives no hint that its addition was intended to change the substantive meaning of the phrase. Therefore, I adopt Judge Knapp's careful analysis and dismiss this ground for recovery.

## V.

Plaintiffs' final two theories of recovery may be considered together. Unlike the previous two claims, neither theory points to a specific statutorily prescribed procedure which New York Fed failed to follow. Rather, plaintiffs propose two alternative courses of conduct which, it is alleged, New York Fed in the exercise of ordinary care should have followed to prevent Union Trust's loss. They thus suggest ways in which New York Fed failed to live up to the duty of ordinary care imposed by N.Y. U.C.C. § 4–202(1).

## A.

Upon receiving the check stamped "Sent in Error" from Albany State, New York Fed routed it to the Philadelphia Fed. Plaintiffs argue that at this point New York Fed should instead either have noti-

---

**15.** Whether in these circumstances Operating Circular No. 6 created a duty in Albany State to wire advice of nonpayment is a question I need not reach, since Albany State is not a party to this action.

fied Union Trust or PNB of Albany State's nonpayment before sending the check to Philadelphia Fed or have returned the check directly to PNB, which presumably would have timely notified Union Trust of the return. Underlying both of the arguments is the theory that New York Fed's legal duties required it to examine the check, recognize the possibility either that the check was fraudulent or that routing to Philadelphia Fed could cause excess delay, and take some affirmative action to alert Union Trust to the problem. The failure to recognize and alert downstream banks to the possibility of delayed or nonexistent payment is alleged to represent a failure of ordinary care. Whether this failure was in fact negligent is, as was noted above, a question to be determined from all the facts and circumstances which cannot be resolved on a motion to dismiss. New York Fed responds, however, that for various reasons it had no duty to take the actions which plaintiffs urge were proper.

### B.

■ New York Fed first argues that under § 4–202(1) it was required only to send notice of dishonor or to return the unpaid check to its transferor and that its sending the check to Philadelphia Fed satisfied the latter requirement. This position critically misstates the obligation imposed by N.Y.U.C.C. § 4–202(1)(b). That subsection reads in relevant part:

> (1) A collecting bank must use ordinary care in...
> (b) sending notice of dishonor or non-payment or returning an item...to the bank's transferor or directly to the depository bank...after learning that the item has not been paid or accepted, as the case may be...."

The statute does not state that a bank must send notice or return an item upon learning of dishonor. Rather, it requires a bank to use ordinary care in sending notice or returning a dishonored item. The difference is significant, for the former interpretation renders the statute pointless. A paying or collecting bank has little choice upon learning of dishonor than to send notice or return the check. The message of § 4–202(1)(b) is that not only is a collecting bank to notify downstream banks of dishonor but it is to exercise ordinary care in doing so. This includes the duty to use ordinary care both in routing the check and in selecting intermediary banks.

Official Comments 1. & 2., N.Y.U.C.C. § 4–202 (McKinney 1964).[16]

### C.

Contrary to the provisions of N.Y.U.C.C. § 4–202(1)(b), New York Fed did not return the check to its actual transferor, PNB. Instead it sent the check to the Federal Reserve Bank of which PNB was a member, Philadelphia Fed. Defendant argues that this course was proper under 12 C.F.R. § 210.4, a Federal Reserve regulation designed to speed the processing of checks which must travel between Federal Reserve districts for collection.[17]

A brief explanation is in order. Commercial banks maintain no formal commercial relations with Federal Reserve Banks outside their own district. In order to collect a check drawn on a bank outside their own Federal Reserve district, this structure requires them to send the check to their own Federal Reserve Bank, which then forwards the check to the Federal Reserve Bank in the district of the bank on which the check is drawn. It is this latter Reserve Bank which forwards the check to the payor bank. Beckhart, *supra* note 7, at 69. Recognizing that this is a rather cumbersome process, the Federal Reserve System has established an internal bookkeeping system which permits Reserve

---

**16.** Although the Official Comments speak of exercising care in routing and choosing intermediates when forwarding a check for presentment, it seems clear that similar care should be exercised in forwarding a check for return. The tasks are quite similar.

**17.** The regulation referred to has been amended somewhat since 1980, when the events under consideration occurred. The 1980, rather than the current, version will be followed in this opinion, although the changes are primarily stylistic.

Banks to accept for collection checks sent by commercial banks outside their district. The object is to permit the banks to bypass their own Federal Reserve Banks and send out-of-district checks directly to the Federal Reserve Bank in the district of the payor bank. By eliminating one bank from the chain of collection, this significantly speeds check processing. It is primarily the larger banks which avail themselves of this convenience. *Id.* The "direct send" process is authorized by § 210.4(a), which in 1980 read in relevant part:

> ... as permitted or required by [a bank's own] Federal Reserve Bank, [any] sender may send direct to any other Federal Reserve Bank any cash item ... payable within the district of such other Federal Reserve Bank.

PNB took advantage of § 210.4(a) in sending this check to New York Fed, the Federal Reserve Bank in the district of Albany State.

It is 12 C.F.R. § 210.4(b) on which New York Fed relies to justify its returning the check to Philadelphia Fed rather than PNB, its actual transferor. Section 210.4(b) is part of the regulation authorizing "direct send" transfers. It states that whenever a bank takes advantage of § 210.4(a) by sending a check directly to a Federal Reserve Bank of which it is not a member,

> the relationships and the rights and liabilities existing between the sender, the Federal Reserve Bank of its district and the Federal Reserve Bank to which the item is sent will be the same, and the provisions of this Subpart will apply, as though the sender had sent such item to the Federal Reserve Bank of its district and such Federal Reserve had forwarded

the item to the other Federal Reserve Bank.

12 C.F.R. § 210.4(b) (1979).

▮ New York Fed draws on § 210.-4(b) to make two arguments. First, it argues that the regulation effectively deemed Philadelphia Fed its transferor for the purposes of N.Y.U.C.C. § 4–202(1)(b). As a consequence, when New York Fed sent the check to Philadelphia Fed it was returning the check to its *de jure* transferor and committed no *per se* violation of § 4–202(1)(b) by failing to return the check to its "transferor." I accept this argument. The language is quite plain that when an item is "direct sent" under § 210.4(a) "the relationships ... existing between the sender, the Federal Reserve Bank of its district, and the Federal Reserve Bank to which the item is sent will be the same ... as though the sender had [first] sent the item to the Federal Reserve Bank of its district." 12 C.F.R. § 210.4(b) (1979). If PNB had first sent the bogus check to its own Reserve Bank, it would have sent it to Philadelphia Fed, and the relationship between Philadelphia Fed and New York Fed would have been one of transferor-transferee. Section 210.4(b) thus authorized New York Fed to deem Philadelphia Fed its transferor and return the check to it in pursuance of N.Y.U.C.C. § 4–202(1)(b).[18]

▮ New York Fed's second argument involving § 210.4(b) goes one step further. It is that not only did § 210.4(b) authorize the return of the check to Philadelphia Fed, it required it. The result is that according to Official Comment 4. of N.Y.U.C.C. § 4–103, New York Fed would prove ordinary care as a matter of law through compliance with an applicable Federal Reserve regulation.

---

**18.** It is entirely appropriate that the Federal Reserve Banks keep for themselves in ordinary circumstances the right to return checks through normal channels. In the absence of § 210.4(a), banks would be unable to deal directly with Federal Reserve Banks of which they were not members. Section 210.4(a) is, then, a special dispensation to banks which permits them to speed the collection of their checks and to reduce the cost to the system as a whole of

their processing. It lies within the power of the Federal Reserve Banks to grant commercial banks the right to direct send without concomitantly taking on themselves the tremendous administrative burden that direct return would entail. Section 210.4(b) forewarns banks that checks which they choose to direct send will not be returned directly to them, and the commercial banks may thus take appropriate measures to account for this.

Nothing in the language of § 210.4(b) requires that Federal Reserve banks return directly sent checks through Federal Reserve banks. The regulation simply says that the banks involved will act as though the check had not been directly sent. This certainly permitted New York Fed to return the check, but it is not clear that it required such action. New York Fed has produced no regulation which requires it to return a check to another Federal Reserve Bank when direct send is not used.[19] Another Reserve regulation, 12 C.F.R. § 210.-6(a) recognizes that Federal Reserve banks will be liable for a failure to exercise ordinary care. I would be loathe to accept an interpretation of the very general language of § 210.4(b) which would require Reserve Banks to avoid "direct return" even though to do so exposes another bank to an unreasonable risk of loss. In any event, I find it unnecessary to decide. Assuming that New York Fed chose to construe § 210.4(b) as it claims, it was then under a duty, as discussed below, to send notice in some other manner so as to prevent foreseeable loss.

### D.

 It is not a foregone conclusion, however, that New York Fed's forwarding the check to Philadelphia Fed was in any way negligent. It is interesting to note in this connection that although the defendant contends that it "returned" the check to Philadelphia Fed, it is impossible to determine on the information in the pleadings, and perhaps it will ultimately be impossible to determine at all, whether New York Fed sent the check to Philadelphia Fed intending that it be returned or that it be forwarded for collection to First Penn. Because both PNB, to which the check would be returned, and First Penn, to which it would be forwarded for collection, are in the Philadelphia Reserve District, New York Fed's action in sending the check to Philadelphia Fed was consistent with either intention. As discussed above, only in extraordinary circumstances does a Federal Reserve bank send an item for either return or collection to a bank other than a Federal Reserve Bank in another district.

This ambiguity is relevant to the difficulties in plaintiffs' theory of liability. Regardless of New York Fed's intention in sending the check to Philadelphia Fed, if the Philadelphia Fed had then returned the check to PNB the loss would not have occurred, for Union Trust would presumably have received notice of Albany State's dishonor on May 14, the day before it released funds to Goldstein. The forwarding to Philadelphia Fed thus was not in and of itself negligent, nor was it necessarily a cause of Union Trust's loss. The only risk which arguably made New York Fed's action negligent was the risk which materialized: that Philadelphia Fed would not recognize the fraudulent nature of the check and would forward it to First Penn for collection. Of course, there is no guarantee that sending the check to PNB would have avoided this risk. PNB could have sent the check to First Penn as easily as Philadelphia Fed, and the total handling time would have been no shorter.

Whether New York Fed's behavior constituted a lapse in ordinary care thus revolves around three factors: the foreseeability of Philadelphia Fed's failure to return the check, the foreseeability of loss resulting from that action, and the feasibility, given modern banking procedures, of New York Fed's detecting the fraud, discerning the risk, and taking curative action. Section 4–202(1)(b) of the U.C.C., which requires ordinary care in notifying downstream banks of dishonor, is best interpreted as requiring a bank to send notice of

---

**19.** Defendant argues that there is no provision in the Regulations which authorizes direct return, but it is not clear that such an action would require express authorization. Section 210.4(b) does not by its express terms bar direct return, and it may be argued that under appropriate circumstances direct return could proceed by analogy to 12 C.F.R. § 210.7(d) (1979), which authorizes Federal Reserve Bank to present a check for payment directly to a bank outside of its own district. If such direct presentment is permissible, certainly direct return, the occasionally urgent need for which is illustrated by the instant action, would be, too.

dishonor reasonably calculated to reach the depository bank in time to prevent a withdrawal against a dishonored check.[20] Ordinarily, the seasonable return of a dishonored check is such notice, justifying the express mention of check return in § 4-202. However, as noted in Official Comment 2. to N.Y.U.C.C. § 4-202, the duty of a bank in presenting a check, and by logical implication returning one, goes beyond acting in a timely manner; a bank must also use ordinary care in choosing the route which a check will take. The check which New York Fed forwarded to Philadelphia Fed bore two inconsistent payor bank designations, a nonsensical MICR number, and a stamp reading "Sent in Error" which demonstrated nonpayment by one of the designated payor banks. If it was reasonably foreseeable that Philadelphia Fed would forward such a check to First Penn for collection rather than return it to PNB, that it would be dishonored by First Penn, and that Union Trust would release funds against the check before receiving timely notice of dishonor from First Penn, then New York Fed failed to use ordinary care in routing the check to Philadelphia Fed without taking some precaution to avoid the foreseeable risks. Because it apparently sent no other notice of dishonor to Union Trust, it would have failed in its duty of ordinary care under § 4-202.[21] *Cf. Northpark*, 572 F.Supp. at 533-535.

**20.** I recognize that § 4-202(1)(b) is not phrased in such general terms. Rather it requires that a bank use ordinary care in sending notice of dishonor or returning the dishonored check. As New York Fed points out, returning the check does provide notice, since the check is generally stamped "unpaid" by the dishonoring bank. However, because returning the dishonored check is a nearly universal practice within the industry, a fact which must have been known to the drafting committee, New York Fed's argument raises the question of why the alternative requirement of sending notice was included at all. Plainly the drafting committee did not intend both notice and return in all cases, since it made the provisions disjunctive. However, by including the separate provision for notice, it seemed to indicate recognition that the standard practice of returning a check, which does provide notice, would not always suffice. The reference to notice is otherwise essentially redundant. I can only conclude that the drafting committee intended notice when returning the check would be ineffective. Simply returning the check does not demonstrate ordinary care under § 4-202 if it is reasonably foreseeable that the check will not reach the depository bank in time to prevent loss. *See, i.e., Northpark, supra*, 572 F.Supp. at 530. Judge Knapp reached an essentially similar conclusion in *Northpark*, though by a different route, in finding that the U.C.C.'s watchword is " 'flexibility' " and that a "mechanical test for what constitutes 'ordinary care' in a novel situation" is impossible. 572 F.Supp. at 533, 534. New York Fed argues that notice is intended to be sent only if returning the check is impossible. The statute makes no express mention of this intention, and I find none in the legislative history. Further, it appears that the U.C.C. drafters expressly noted when the unavailability of a check made notice solely appropriate. *See* N.Y.U.C.C. § 4-301(1)(b). Plainly notice would be appropriate if return of the check was impossible, but the failure to restrict notice to this circumstance convinces me that the drafters intended notice when return would be either impossible *or* ineffectual.

**21.** Defendant in its moving papers argues that the duty to send notice of nonpayment never arose because only a paying bank may determine whether an item cannot be paid and Albany State was not a paying bank. This rather startling assertion is blandly based on U.C.C. § 3-118(c), which states that "words control figures." Since First Penn is the paying bank designated by letters rather than numerals, the argument goes, it is the "real" paying bank, and the check could not be deemed unpayable until rejected by First Penn. In analyzing this argument, it is important to keep in mind why it matters who was the paying bank. Section 4-202(1)(b) requires notice when a check is rejected. The purpose of § 4-202(1)(b) is not, however, to inform the depository bank of the dishonor *per se;* rather, it is to prevent the depository bank from releasing funds against the check because the depository bank has assumed payment. It is irrelevant, then, whether the rejecting bank was a paying bank, that is, was the bank on which the check was intended to be drawn. Here, of course, there was no paying bank. What matters is whether the rejection is likely to cause harm to the depository bank. Since arguably in this case it was, that Albany State was sent the check for payment and refused to honor it was all that was necessary to trigger the duty of notice under § 4-202(1)(b). New York Fed's worry about liability for misinforming Union Trust of nonpayment prior to ultimate consideration by First Penn was thoroughly answered by Judge Knapp. As noted in *Northpark, supra*, 572 F.Supp. at 535 n. 25, New York Fed could tailor the notice sent to Union Trust to explain that Albany State had refused to pay the check, and it was being forwarded to

### E.

The concept of "reasonably foreseeable" in this context must be elaborated. As Judge Knapp noted in *Northpark*, 572 F.Supp. at 534, ordinary care must be determined with regard to "sound banking practice." In other words, although Official Comment 4. of U.C.C. § 4–103 requires that "ordinary care" be "used with its normal tort meaning," the realities of the modern banking system cannot be ignored in evaluating a bank's negligence. These realities are, after all, some of the "circumstances" which tort law commands us to consider in determining reasonableness.

To the outsider, modern check processing resembles a high stakes game of hot potato. Banks pass checks from hand-to-hand in order to avoid being caught with the check at the expiration of their midnight deadline. The system appears to work amazingly well in the ordinary course of business. It seems wholly unfair to impose liability on New York Fed if detection of this sophisticated fraud was wholly inconsistent with participation in the system.[22] If efforts by all banks to detect this type of fraud would bring check processing to a screeching halt, New York Fed cannot be faulted for not making those efforts. Consequently, before liability can be imposed on New York Fed more questions must be asked than those framed in section V.(D) above.

Initially, it must be determined whether this type of fraud is so common that New York Fed in the exercise of ordinary care should have taken exceptional precautions to detect it. Whether the fraud was so common as to warrant such measures is a question of fact to be resolved at trial, but it appears that this type of scheme is rather new and as yet uncommon. *See Northpark, supra,* 572 F.Supp. at 533; *but see id.,* at 534 n. 24.

If it is determined that special precautions were unwarranted, it must then be determined whether standard banking procedures should have led to detection of the problem and anticipation of Union Trust's loss. This involves two separate questions. The first is whether it is reasonably foreseeable that a check bearing inconsistent routing designations will be rejected by the second payor bank to which it is sent. It may well be that ordinarily such inconsistencies result from innocent printers' errors which do not justify alarm. *See Northpark, supra,* 572 F.Supp. at 534. If the latter is true, it must then be asked whether the individual characteristics of this particular check were such as to differentiate it from checks which result from printers' errors. In other words, New York Fed may yet be held liable if a bank exercising ordinary care in the standard processing of returned checks would have recognized this to be a bogus check.

### F.

In sum, I cannot say as a matter of law that New York Fed was not required to take any affirmative action to prevent Union Trust's loss other than the forwarding of the check to Philadelphia Fed. If New York Fed in the exercise of ordinary care, as described in section V.(E) above, should have reasonably foreseen the possibility of Philadelphia Fed's forwarding the check to First Penn and First Penn's nonpayment, it had a duty to take other steps to prevent Union Trust's loss.

### VI.

New York Fed asserts two final defenses. First, it argues that public policy, as embodied in footnote 3 of 12 C.F.R. § 210.6(a) (1979), requires that it be except-

---

Philadelphia Fed. By proper phrasing defendant could have avoided stating that the check had been completely dishonored.

**22.** The U.C.C. recognizes that in some circumstances the practical realities of modern check processing make strict adherence to traditional law of negotiable instruments impossible. *See,* e.g., N.Y.U.C.C. § 3–206(2), Official Comment 3. (McKinney 1964) (permitting intermediary and payor banks to regard check indorsements because such banks handle checks in bulk and "have no practicable opportunity to consider the effect of restrictive indorsements").

ed from liability in these circumstances. Footnote 3 is found at the end of a sentence which reads, "[a] Federal Reserve Bank shall not have ... any liability to the sender ... except for its own lack of good faith or failure to exercise ordinary care.[3] " 12 C.F.R. § 210.6(a) (1979). The footnote reads:

[3] No Federal Reserve Bank shall be responsible to the sender of any cash item, or any other owner or holder thereof, for any delay resulting from the action taken by the Federal Reserve Bank in presenting, sending, or forwarding the item on the basis of (a) any A.B.A. transit number or routing symbol appearing thereon at the time of its receipt by the Federal Reserve Bank, whether inscribed by magnetic ink or by any other means, and whether or not such transit or routing symbol is consistent with each other form of designation of a paying bank (or nonbank payor) then appearing thereon, or (b) any other form of designation of a paying bank (or nonbank payor) then appearing thereon, whether or not consistent with A.B.A. transit number or routing symbol then appearing thereon.

The textual sentence and the footnote must be read together. The text explicitly acknowledges that Federal Reserve Banks accept responsibility for their own negligence. The footnote should be regarded as a gloss on this acknowledgment: that it is not to be regarded as negligence for a Reserve Bank to forward a check based on its numerical routing symbols, regardless of whether those signals are correct or internally consistent. It appears that this would provide a complete defense to any alleged liability accruing from New York Fed's initial forwarding of the check to

Albany State, an act clearly taken in reliance on the routing number printed in the upper right-hand corner, but this act is not alleged as a basis of liability. There are several reasons why footnote 3 does not reach the later sending to Philadelphia Fed. Defendant has consistently maintained that its sending the check to Philadelphia Fed was a return, not a forwarding for collection. Assuming that as true, the routing was based not on the routing symbols but on the endorsement of PNB, the transferor of the check to which it was to be returned. Even if the forwarding to Philadelphia Fed was intended as an act of presentment, the forwarding itself would have been based on the written designation of First Penn as payor, not on any numerical routing symbol. More important, it is not the forwarding *per se* which constitutes the alleged negligence. Rather, it was the failure to take steps to avoid a foreseeable risk of harm to Union Trust. Footnote 3 seems intended to guard against liability based on misrouting in adherence to an undetected printer's error, not against the more substantial negligence alleged here. *Northpark, supra*, 572 F.Supp. at 534 n. 23; *see, e.g., Citizen's State Bank v. Martin*, 227 Kan. 580, 609 P.2d 670 (1980).

██ Nor do I find persuasive the defendant's argument that Union Trust, as the bank which accepted the check, should be held solely responsible. It is true that Union Trust was able to observe the depositor and might have had the best chance to examine the check. It is not clear—certainly as a matter of law—that in these circumstances its failure to recognize the fraudulent nature of the check constituted negligence so gross as to bar this action.[23]

**23.** *Perini Corp. v. First National Bank of Habersham County*, 553 F.2d 398 (5th Cir.1977), cited by defendants, recognizes the legitimacy of a policy such as this in reviewing the justification for a provision of the U.C.C. which expressly imposes ultimate liability for forged indorsements on the depository bank. It is essential to note, however, that that rule of liability was expressly adopted by the U.C.C. drafters and the legislature. The complex balancing of various policy goals embodied in the adoption of such a rule of law, which imposes liability without

regard for fault in the interest of efficient dispute resolution, 553 F.2d at 405, is properly for the legislature. My job is to follow the rules already adopted, which instruct that New York Fed is to be held liable if it breached its duty of ordinary care. N.Y.U.C.C. § 4–202(1)(b).

Whether documented negligence on the part of Union Trust should be permitted to reduce any award against New York Fed is a question to be reserved for another day. *See Northpark, supra*, 572 F.Supp. at 535 n. 28.

Defendant's last argument urges the adoption of a uniform nation-wide statute of limitations of two years for actions against Federal Reserve Banks over their handling of checks. Plaintiff urges reference to the U.C.C. provision stating that actions against banks are governed by the law of the place where the bank is located. N.Y.U.C.C. § 4–102(2). Since New York actions for negligence are governed by the three-year period of N.Y.C.P.L.R. § 214(4), plaintiffs' action is timely under their theory, untimely under defendants'.

Under the presumption which has prevailed throughout this opinion that state law applies, N.Y.U.C.C. § 4–102(2) controls. Only if federal common law properly applies and dictates a statute of limitations different from that of New York state law would defendant's theory prevail. I find, however, that even if federal common law did apply it would not dictate a different statute of limitations. In its initial memorandum of law, defendant argued that the embodiment of federal common law in this area is the Permanent Editorial Board's edition of the U.C.C. This edition contains a provision identical to that of N.Y.U.C.C. § 4–102(2), requiring that liability of a bank be determined by reference to the law of its place of location. 2A U.L.A.U.C.C. § 4–102(2) (West 1968). Thus the defendant's preferred version of federal law dictates that the New York statute of limitations be applied.

Even assuming that federal law does not specifically dictate a statute of limitations, application of New York's statute is appropriate. Ordinarily when Congress has established no clear statute of limitations, that of local law is adopted. *Del Costello v. International Brotherhood of Teamsters*, 462 U.S. 151, ——, 103 S.Ct. 2281, 2287, 76 L.Ed.2d 476 (1983); *Runyon v. McCrary*, 427 U.S. 160, 180–181, 96 S.Ct. 2586, 2599–2600, 49 L.Ed.2d 415 (1976). Exceptions to this general rule are adopted

only when applicable state law is "unsatisfactory" or "inappropriate." *Del Costello, supra*, 462 U.S. at ——, 103 S.Ct. at 2289. Defendant has demonstrated no grounds for holding that the application of state law in this case is either. Its primary argument is that this is a situation in which a uniform nationwide statute of limitations is desirable. It must be remembered that "uniformity" is a relative concept. New York Fed's rule would provide uniformity from the view of Federal Reserve Banks. From the perspective of plaintiff commercial banks, however, the rule creates a fifty-first statute of limitations to add to the fifty extant. This hardly clears up confusion. Moreover, as pointed out by plaintiff, uniformity from the perspective of Federal Reserve Banks already exists. Because under U.C.C. § 4–102(2), a provision adopted by all states, the law of the site of the bank prevails, each Reserve Bank must contend with only one statute of limitations—that of its home state. Because litigation of this type is always against individual Reserve Banks rather than the system as a whole, that each bank faces a different statute has no practical effect. New York Fed need only face N.Y.C.P.L.R. § 214(4). Its plea for uniformity is a frivolous attempt to avoid a decision on the merits.[24]

## VII.

Plaintiffs' attempts to find in paragraph 20 of Operating Circular No. 4 (1979) and in N.Y.U.C.C. § 4–202(1)(e) a provision which required New York Fed to notify Union Trust of Albany State's dishonor are unavailing. Plaintiffs may, nevertheless, be able to demonstrate that the failure to notify breached the defendant's general duty of ordinary care. For that reason, as described above, the motion to dismiss is denied.

The parties are directed to proceed with discovery in accordance with the provisions

---

**24.** New York Fed also argues that geographic location should not affect liability of the individual Reserve Banks. Because all states have passed Title 4 of the U.C.C., geography will not affect substantive liability. That individual Banks must live by different statutes of limitation causes the system no discomfort and certainly works no injustice.

of the separate order filed along with this opinion.

It is SO ORDERED.