SUN BANK/MIAMI, N.A.

v.

The FIRST NATIONAL BANK OF MARYLAND, First Omni, N.A., and Federal Reserve Bank of Richmond.

Civ. A. No. N–87–812.

United States District Court, D. Maryland.

Nov. 8, 1988.

Diana G. Motz, Dana Whitehead, and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for plaintiff.

David J. McManus, and Gebhardt & Smith, Baltimore, Md., for defendants First Nat. Bank of Maryland and First Omni, N.A.

Lee H. Ogburn, Joseph H. Young, and Kramon & Graham, Baltimore, Md., for defendant Federal Reserve Bank of Richmond.

## MEMORANDUM

NORTHROP, Senior District Judge.

Sun Bank/Miami, N.A. ("Sun Bank"), the depositary bank, brought this diversity action against collecting banks First National Bank of Maryland ("First National") and Federal Reserve Bank of Richmond, Baltimore Branch ("Federal Reserve"), to recover damages it sustained as a result of a check fraud perpetrated against it by Jack L. Trotti, a nonparty. Sun Bank later amended its complaint to add as a defendant First Omni Bank, N.A. ("First Omni"), the payor bank and the institution responsible for the VISA line of credit against which Trotti's forged checks were drawn. Sun Bank alleged that Federal Reserve, First National and First Omni failed to exercise ordinary care in connection with the presentment, notification of dishonorment, and/or return of a forged check. Sun Bank sought $150,000 in damages, representing the face value of the check. Federal Reserve, First National and First Omni asserted separate counterclaims for court costs and attorney's fees pursuant to 12 C.F.R. § 210.12(c)(6) and (7) (1988).

The action came before the Court for a three-day bench trial. After considering the memoranda submitted by the parties, the testimony and evidence admitted at trial, and the closing statements of counsel, the Court determines that Sun Bank was in the best position to prevent the loss of the $150,000 check, and that its negligence substantially contributed to this loss. The Court's findings of fact and conclusions of law in support of its decision follow.

### I. Findings of Fact

#### A. The Opening and Handling of the Trotti Account

On April 28, 1986, Jack Trotti opened a personal checking account with Sun Bank. Trotti used as his initial deposit a check that he forged and that he made payable to his order for $6,750. The check was in the name of Andrew Peter Holub and was drawn against a VISA classic charge-check

account at First Omni.[1] It had a $2,100 credit limit and was marked "payable through First National Bank of Maryland." First National, as the payable-through bank, was obligated to pay the check upon presentment even though the account was with First Omni.

At the time Trotti opened his account, a Sun Bank account officer, identified as a "Miss Travieso," advised him that new account holders were not to write checks against uncollected funds. She also explained to him Sun Bank's deposit hold policy. Pursuant to this policy, Travieso placed a standard four-day hold on Trotti's $6,750 check, to expire on May 2.

On April 29, Trotti deposited a second check drawn against Holub's VISA classic charge-check account. This check was in the amount of $150,000. It, too, was a forgery. On its face appeared the notation that it was for the purchase of a house. Pursuant to its deposit hold policy, Sun Bank placed the standard four-day hold on the $150,000 check, to expire on May 5.

Also on April 29, Trotti wrote a $50,000 check against his account and presented it to Sun Bank for payment.

On April 30, the Sun Bank account officer reviewing Trotti's account received the Report of Insufficient/Uncollected/Unavailable Funds for April 29. The Report indicated that Trotti wrote the $50,000 check against uncollected funds. The account officer returned the check unpaid and charged Trotti's account a $20 uncollected funds charge.

On May 1, the account officer received the Report of Insufficient/Uncollected/Unavailable Funds for April 30. The Report indicated that Trotti wrote four more checks against uncollected funds. The account officer returned unpaid all four checks, totaling $4,140.88. The Report for April 30 also indicated that there was a manual hold on the $6,750 check. The hold was placed on the check in response to a telephone notice of dishonorment for insuf-

ficient funds sent from First National employee Linda Truitt to Sun Bank employee Janet Panton on April 30.

On May 2, the account officer received the Report of Insufficient/Uncollected/Unavailable Funds for May 1. The Report indicated that Trotti wrote another three checks against uncollected funds. The account officer returned unpaid all three checks, totaling $8,480.

On May 5, Sun Bank began paying checks against the $150,000 forgery.

Sun Bank microfilms all checks deposited into its customers' accounts. By making a research request, Sun Bank's account officer could have determined that both the $6,750 check and the $150,000 check were drawn against the same VISA charge-check account. With this information, the account officer could have placed a manual hold on the $150,000 check, extending the four-day hold period until she received it.

## B. The Path of the $150,000 Check
### The Actions of First Omni and First National

Federal Reserve received the forged $150,000 check from Sun Bank on April 29 and presented it to First National in Baltimore on April 30. Pursuant to its agreement with First Omni to act as the payable through bank, First National processed the check.[2] As part of its processing services, First National captured the check on microfilm and made an initial determination that the check created an overdraft in Trotti's account.

On the morning of May 1, First National presented the check to First Omni to make the final determination of whether to pay or to return the check. First Omni clerk Mary Veasey awaited its delivery. When the check did not arrive on the May 1 courier package as expected, Veasey requested a photocopy of the check taken from microfilm. From the photocopy, Veasey found that the check exceeded Ho-

---

1. A VISA charge-check is a credit instrument. Funds are withdrawn against a revolving line of credit rather than against customer deposits.

2. At the time it processed this check, First National's processing center for incoming retail checks was located on the same site as First Omni.

lub's $2,100 credit limit, and decided to dishonor the check for insufficient funds. She then sent the photocopy to First National employee Linda Truitt to make the return and any required notification to the depositary bank.

Veasey was the same First Omni clerk who decided to dishonor the $6,750 check on April 30. Her supervisor, Grace Lehman, recognized the connection between the two checks, and commented to another employee about the notation "house" on the $150,000 check. Lehman referred copies of both checks to First Omni's security department for investigation.

When First National employee Truitt received the check from Veasey in the early afternoon of May 1, she was unable to ascertain from the back of the photocopy that Sun Bank was the depositary bank. Although she remembered the dishonor of the $6,750 deposited at Sun Bank the day before, she telephoned Federal Reserve to request that it determine the depositary bank and make notice of dishonor to that bank on First National's behalf.

Truitt's telephone call to Federal Reserve was received by senior returns check clerk Annie Louise Barber. Truitt told Barber that First National had a large-item return on which it could not identify the depositary bank. This conversation was recorded in accordance with standard Federal Reserve procedures.

During the telephone conversation, Truitt, reading from the photocopy of the check, provided Barber with certain information about the check, including Trotti's name. She spelled Trotti's name for Barber twice. She also told Barber that she thought Sun Bank was the depositary bank.

After the telephone call, Barber learned from her supervisor, Virginia McMichael, that Federal Reserve would not accept information about a dishonored check over the telephone when the depositary bank was unknown. McMichael so notified First National manager Larry Reed and instruct-ed him to send the photocopy of the check to Federal Reserve so that it could obtain the necessary information for the wire notice from that photocopy.

Following these instructions, Reed made the return within the midnight deadline by sending to Federal Reserve the photocopy of the check in a return items letter (a preprinted form). The return items letter incorrectly identified the bank which sent it as the Salisbury branch of First National instead of the Baltimore branch.[3]

On May 2, First Omni found the original $150,000 check sent from First National. First Omni supervisor Lehman showed the check to First National manager Reed. The name of the depositary bank, Sun Bank, was legible to them both. Lehman did not forward the original check because a photocopy already had been used to make the return.

### The Actions of Federal Reserve

Federal Reserve investigated its records and determined that Sun Bank was the depositary bank. Relying on the return items letter and the photocopy of the $150,000 check received from First National on May 2, Federal Reserve employee Barber prepared a wire notice for Sun Bank which she sent that same day.

The purpose of a wire notice is to provide notice of dishonor to depositary banks. Wire notices must include certain information, such as the paying bank's name, the payee's name, the amount of the check, the reason for the return, the date of the depositary bank's indorsement, the depositor's account number, the branch at which the check was first deposited, and the tracer number. *See* 12 C.F.R. § 210.12(c)(3) (1988). A bank making a notice of dishonor "is not required to provide any information in the notice that it, after exercising ordinary care and acting in good faith, is not able to determine with reasonable certainty from the item itself." *Id.*

---

**3.** First National has two ABA payor numbers: # 0520–0011–3 for its Baltimore branch and # 0521–0040–8 for its Salisbury branch. It also uses two return items letter forms, one bearing the Baltimore ABA payor number and the other bearing both numbers.

The wire notice of dishonor prepared by Barber contained three errors. First, the notice listed Sun Bank's customer's name as Trutti instead of Trotti. Second, the notice incorrectly identified the payor institution as "First Nat'l Bk Salisbury Md" and incorrectly provided that branch's payor ABA number. The Baltimore branch payor ABA number, which also appeared on the return items letter and was on the face of the photocopy of the check, was the correct one. Barber did not use this number because Federal Reserve policy was to take the payor ABA number of the bank which sent the return item. Third, the notice omitted Sun Bank's tracer number. That number was on the back of the check and was illegible.

In preparing the wire notice, Barber had these documents before her: a photocopy of the $150,000 check; First National's return items letter; Sun Bank's cash letter originally transferring the check to Federal Reserve; and an accompanying tape listing. The tape listing contained Sun Bank's tracer number on the $150,000 check. Barber did not examine the tape listing.

Before sending any wire notification, Federal Reserve procedures required that a second clerk verify the information for accuracy and verify the hard copy of the wire notice. Barber was uncertain whether this verification took place.

On May 2, after transmitting the wire notice to Sun Bank, Federal Reserve microfilmed the photocopy of the check and Sun Bank's cash letter and tape listing, and forwarded these documents to Sun Bank through its Miami branch.

On May 16, Federal Reserve received a notice dated May 5 from the Miami Branch indicating that the photocopy of the $150,000 check was lost. On May 19, Federal Reserve contacted First National to request an additional copy because its microfilmed photocopy was illegible. On May 28, Federal Reserve received a second photocopy of the check from First National and forwarded it to its Miami branch. On June 11, Sun Bank finally received the second photocopy. By this time, Trotti had depleted his Sun Bank account and left town.

### The Actions of Sun Bank

Sun Bank employee Janet Panton received Federal Reserve's wire notice regarding the $150,000 check on May 2 at 9:40 a.m. Panton was the same Sun Bank employee who received telephone notice of dishonor of the $6,750 check from First National on April 30. The log she maintained shows that Linda Truitt at First National advised her that a check drawn against the account of an Andrew Peter Holub for $6,750 was deposited into the Trotti account with Sun Bank and that the check was being dishonored.

Upon her receipt of the wire notice, Panton was required to locate the customer's account and place a manual hold against the $150,000 check. Under the procedures established by Sun Bank, Panton conducted three separate searches on its "Vector–V" computer system. First, Panton input the date and tracer number of the depositary bank. This search did not yield the customer's account because Federal Reserve's wire notice omitted the tracer number. Second, Panton input the check's date, the dollar amount, and the payor ABA number. This search did not yield the customer's account because Federal Reserve's wire notice erroneously listed First National's Salisbury branch ABA payor number. Third, Panton input the name of its customer as listed on the wire notice. This search did not yield the customer's account because the wire notice misspelled Trotti's name.

Sun Bank's "Vector–V" computer system had the capacity to perform a date and amount search. A date and amount search allows the clerk to locate a customer's account based only on the date of the deposit of the check and the face amount of the check. If Panton had conducted a date and amount search, she would have input the date the check was deposited at Sun Bank (April 29) and the amount of the check ($150,000), both of which were set forth accurately on the wire notice. The "Vector–V" system would have displayed a screen listing every $150,000 check deposit-

ed at Sun Bank on April 29. Using Sun Bank President Robert Coords' estimate, approximately twenty such checks would have appeared on the list. From this listing Panton could have located Trotti's account within an hour's time.

Panton did not conduct a date and amount search because it was not Sun Bank's policy to do so. Sun Bank employees believed that such a search was too time-consuming.

Panton also did not send a "service wire" to Federal Reserve or call First National for additional information. Sun Bank's policies did not require these measures, and its employees testified that they did not find them to be effective.

As a result of Panton's inability to locate the customer's account on the computer, she logged the wire notice as a "no hit" and put it in a "pending file" in her desk drawer to await receipt of the original check.

According to Sun Bank policy, a clerk must notify her supervisor in the event of a "no hit." The supervisor retraces the clerk's steps to ensure that no mistake is made in inputting the data into the computer. Sun Bank management concluded that Panton did not notify her supervisor of the "no hit" and fired her for "failure to follow company procedures, which could result in a $150,000 loss to the bank."

No Sun Bank employee reviewed the wire notices in the "pending file" from May 2 until June 11. At the time, Sun Bank did not have a procedure requiring periodic review of the "pending file" to determine whether any "no hit" wires remained unresolved.

On June 11, more than a month after it sent the check for collection, Sun Bank received the photocopy of the dishonored check.

Sun Bank claims that First Omni, First National and Federal Reserve failed to exercise due care in handling the $150,000 check pursuant to Md.Com.Law Code Ann. § 4–202(1) (1975). Specifically, Sun Bank claims that First Omni was negligent in failing to discover that the VISA charge-checks were fraudulent; that First National was negligent in failing to notify Sun Bank directly of the dishonorment and in failing to promptly make a second photocopy of the check for Federal Reserve; and that Federal Reserve was negligent in failing to prepare an accurate wire notice, in failing to have a second clerk verify the information contained in the wire notice, and in failing to notify Sun Bank of the loss of the photocopy of the check and of the delay in sending a duplicate copy.[4]

First Omni, First National, and Federal Reserve all claim that Sun Bank failed to exercise due care in that it was on notice of the activity in Trotti's account, it knew about the inaccuracies in the wire notice of dishonor, and it did nothing to identify its customer's account.

## II. Conclusions of Law

The Uniform Commercial Code ("UCC") requires a collecting bank to act in "good faith" and "exercise ordinary care" in its banking activities. See Md.Com.Law Code Ann. § 4–103(1) (1975). The term "good faith" means "honesty in fact in the conduct or transaction concerned." Md.Com.Law Code Ann. § 1–201(19) (1975). The term "ordinary care" is used "with its normal tort meaning" and is not used to refer to a standard of care unique to banking. Md.Com.Law Code Ann. § 4–103, comment 4 (1975). However, "[a]ction or nonaction approved by [Article 4] or pursuant to federal reserve regulations or operating letters constitutes the exercise of ordinary care." Md.Com.Law Code Ann. § 4–103(3) (1975). The liability of a collecting bank for action or nonaction with respect to any item handled is determined by the law of the place where the bank, i.e., branch office, is located. Md.Com.

---

**4.** Sun Bank makes the additional claim that First Omni failed to meet its obligation under Md.Com.Law Code Ann. § 4–301(1) (1975) when it returned a photocopy of the check instead of the original. The Court disagrees. The Court finds that the use of a photocopy in lieu of the original is common practice among bankers; further, the UCC has no requirement that only the original of an item be used in making a return.

Law Code Ann. § 4–102(2) (1975).

Section 4–202(1) of the UCC imposes upon a collecting bank which handles checks sent for collection a duty of ordinary care with respect to presentment; sending notice of dishonor or nonpayment; settling for an item after it receives final settlement; any necessary protest; and notifying its transferor of any loss or delay in transit. Md.Com.Law Code Ann. § 4–202(1)(a)—(e) (1975). Implicit in the requirement of ordinary care is the obligation to act in a timely manner. A collecting bank acts seasonably if it takes proper action before its midnight deadline following its receipt of an item, notice or payment. Md.Com.Law Code Ann. § 4–202(2) (1975). The propriety of a collecting bank's action is governed by a general rule of reasonableness. *See United States Fid. & Guar. Co. v. Fed. Reserve Bank*, 590 F.Supp. 486, 491–92 (S.D.N.Y.1984), *aff'd*, 786 F.2d 77 (2d Cir.1986).

A collecting bank is responsible for its own negligence. Md.Com.Law Code Ann. § 4–202(3) (1975). It is excused from liability for "insolvency, neglect, misconduct, mistake or default of another bank or person or for loss or destruction of an item in transit or in the possession of others." *Id.* The measure of damages is the face amount of the instrument if the item was collectible but for the collecting bank's negligence. Md.Com.Law Code Ann. § 4–103(5) (1975).

■ In the case of fraud, the UCC scheme places the loss on the party in the best position to prevent it. *See Northpark Nat'l Bank v. Bankers Trust Co.*, 572 F.Supp. 524, 535 (S.D.N.Y.1983).[5] In this respect the UCC is different from tort law, which apportions liability on the basis of fault. The UCC typically does not look at actual fault. Instead, liability under the UCC falls on the party best situated to protect against the fraud.

While the UCC contains no explicit requirement that a plaintiff demonstrate its own due care as a prerequisite to recovery under § 4–202(1), incorporation of a rule of contributory negligence is consistent with the UCC's twin aims of predictability and efficiency in commercial relations. On the one hand, it increases the efficiency and fraud-resistance of the banking system by placing a burden of due care on a party well-situated to prevent fraud: the depositary bank. On the other hand, it facilitates the speedy resolution of commercial disputes by clearly delineating liability.

■ Finding that application of contributory negligence is appropriate in these circumstances, the Court holds that a depositary bank may be precluded from recovering against collecting banks if it is guilty of negligence which substantially contributed to its own loss. In so holding, the Court follows the reasoning and result reached by Judge Haight in *United States Fidelity & Guaranty Co. v. Federal Reserve Bank*, 620 F.Supp. 361 (S.D.N.Y. 1985) (court applied UCC § 3–406 by analogy and held that depositary bank may be precluded from recovery under UCC § 4–202(1) if its negligence played substantial role in success of fraud), *aff'd*, 786 F.2d 77 (2d Cir.1986).

■ Placing Sun Bank's claims of error within the UCC scheme, the Court concludes that Sun Bank was in the best position to prevent the loss of the $150,000 check, and that its negligence substantially contributed to this loss. The account officer assigned to review new accounts, including the Trotti account, was Sun Bank's "first line of defense" against the fraud. *See United States Fid. & Guar. Co.*, 620 F.Supp. at 364. As of May 2, the account officer had access to information sufficient to put her on notice of a potential problem in the Trotti account. The account officer knew or should have known that Trotti's

---

5. Sun Bank's counsel argued, for the first time in her closing statement, that the federal standard for notification of nonpayment contained in 12 C.F.R. § 210.12(c)(3) (1988) prevailed over the UCC standard with regard to Federal Reserve's liability. The Court rejects this argu-

ment. The Federal Reserve regulation and UCC § 4–202 both establish the duty of due care in the check collection process. In this respect, they are parallel provisions and, in the absence of conflict, no basis for preemption exists.

initial $6,750 deposit had been dishonored for nonsufficient funds on April 30; that during the first four days after Trotti opened his account, he wrote bad checks totaling $62,670.88, in violation of Sun Bank's policy prohibiting new customers from writing checks against uncollected funds; that Trotti's second deposit of $150,000 was drawn against the same account as his initial deposit of $6,750; and that the standard four-day hold on the $150,000 deposit would expire on May 5. With this information, the account officer could have placed a manual hold on the uncollected funds in Trotti's account, yet she failed to do so.

Sun Bank was also the last line of defense. It was the bank with the "last clear chance" to prevent the fraud. *See Northpark*, 572 F.Supp. at 535. Sun Bank received timely notification of a return of a $150,000 check on May 2. It had a state-of-the-art computer system capable of locating a depositor's account based on the date of deposit of the check and the check amount. Federal Reserve's wire notice correctly identified this information. Sun Bank employee Panton could have identified Trotti's account using a date and amount search. According to expert testimony, this would have taken her approximately one hour to do. Panton did not perform the search because Sun Bank had not trained her in its use.

Panton also could have sent a "service wire" to Federal Reserve, requesting additional information or clarification. The use of a "service wire" was a procedure endorsed by other large commercial banks and one which Sun Bank understood was available to it.[6] Finally, Panton could have telephoned First National for more information.

Notwithstanding the need for follow-up action, and despite the large dollar amount involved, Panton made no further effort to identify the account affected by the wire notice. She did not even notify her supervisor of the "no hit," in breach of Sun

Bank's policy to do so. As a result, the $150,000 became available to Trotti on May 5.

Sun Bank's failure to take advantage of alternative measures which were at its disposal, including a date and amount computer search and a "service wire," compounded by its employee's failure to report the "no hit," substantially contributed to its loss in this action. Accordingly, Sun Bank may recover nothing.

A separate order shall issue directing the entry of judgment for First National, First Omni and Federal Reserve, and granting these banks their counterclaims for court costs and attorney's fees.

---

6. After the events giving rise to this case, Sun Bank "refined" its procedures for handling wire notices of dishonor. Sun Bank now requires its employees to place a call or a "service wire" to obtain additional information upon receipt of a "no hit" wire.