NORSTAR BANK OF UPSTATE
NY, Plaintiff,

v.

SOUTHEAST BANK, N.A., Defendant.

No. 86–CV–1369.

United States District Court,
N.D. New York.

Oct. 20, 1989.

**188**

Harvey and Harvey, Harvey & Mumford, Albany, N.Y., for defendant; Jack D. Harvey, of counsel.

McNamee, Lochner, Titus & Williams, P.C., Albany, N.Y., for plaintiff; David J. Wukitsch, of counsel.

## MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

Presently before the court is a motion for summary judgment brought by defendant, Southeast Bank, N.A. ("Southeast") and a cross-motion for summary judgment brought by plaintiff, Norstar Bank of Upstate New York ("Norstar"). The court heard oral argument on these motions on September 26, 1989 in the Federal Courthouse in Albany, New York.

## BACKGROUND

This is the eventful, if uninspiring, life story of a rubber check. There is no dispute regarding the underlying facts. The check was made out in the amount of $21,-000. It was made out to "D.L.V." and drawn on the account of Isla de Pesca in Norstar's Albany, New York branch. The check was deposited in the Ocean Bank of Miami, Florida ("Ocean Bank") on July 2, 1985. On the same day Ocean Bank routed the check to defendant Southeast, which is the "correspondent bank" for Ocean Bank. As correspondent bank, defendant receives checks from Ocean Bank and forwards them on for payment. Southeast routed the check to the First National Bank of Atlanta ("FNB–Atlanta"). From there the check went to the Federal Reserve Bank of New York, Utica ("FRB–Utica"). At last, the check reached Norstar on July 5, 1985. July 5th was a Friday.

On the next business day, July 8, 1985, Norstar discovered that the account on which the check was drawn had been closed. That day plaintiff, Norstar, notified FRB–Utica by phone that the check was dishonored and was being returned. In the notification to FRB–Utica, the Norstar employee handling the matter, Wanda Helms, provided the American Banking Association number ("ABA number") of Southeast. She did not, however, provide the ABA number of Ocean Bank because,

according to her, she did not see Ocean Bank's endorsement on the check.

Three comments shed light on the phone call which Helms placed. First, it appears that Helms initially gave FRB–Utica an ABA number of 660–1739.[1] FRB–Utica, however, informed Helms that was not a proper ABA number. As a result, Helms relayed to FRB–Utica the number, 63–58, Southeast's number. Coincidence or not, Ocean Bank's ABA number is 660–1139, very similar to 660–1739 which was first given to FRB–Utica. Second, John Hoke, an Administrative Assistant at FRB–Utica, later stated upon reviewing the life story of this particular check that Norstar should have also provided FRB–Utica with the ABA numbers of Ocean Bank and FNB–Atlanta. Docket ("Doc.") No. 21, Affidavit of Jack Harvey ("Harvey Affidavit"), Exhibit ("Exh.") D (Letter of April 7, 1986 to Alice Mahar, Assistant Cashier, Norstar). Third, from the photocopies of the check now available, it is not at all clear that Ocean Bank placed its endorsement on the check. What does emerge from the murky reproductions is that D.L.V. deposited the check using a stamped endorsement. The stamped endorsement contained, among other words, the following: PAY TO THE ORDER OF OCEAN BANK OF MIAMI. Even though there may not have been an identifiable endorsement applied by Ocean Bank, the D.L.V. endorsement indicates that Ocean Bank was the depositary bank. Nonetheless, it takes inductive reasoning to reach that conclusion.

Southeast received a telex from FRB–Utica regarding the check on July 8, 1985. The telex informed Southeast that the check was returned; it included the name of the drawer, the name of the payee, Southeast's routing & transit numbers, FRB–Utica's routing and transit numbers, Norstar's ABA number, a notation that the Norstar account was closed and a notation "SE MIAMI FIRST 63–58." This refers to Southeast; the number is its ABA number. One might wonder what "FIRST" means. Perhaps it means that FRB–Utica assumed, based on the information provided by Norstar, that Southeast was the first bank to handle the check, that is, the depositary bank.

Southeast's employee who handled the telex was Arcadia Alvarez. Alvarez wrote "insuf info" on the telex because she did not find the account of the drawer, D.L.V., when she looked for it. Once she determined that there was insufficient information to proceed, Alvarez states that it was Southeast's policy not to take further action on the telex, but to wait for the actual check to be physically returned to Southeast.

However, the check never reached Southeast. It was initially returned to FRB–Utica on July 8, 1985. Doc. 21, Harvey Affidavit, Exh. E. On July 9, 1985 FRB–Utica sent the check back to the Federal Reserve Bank of Miami ("FRB–Miami"). The check was lost en route. Photocopies were not located until July 29, 1985. By the time the photocopies were presented to Ocean Bank, Ocean Bank rejected the claim as untimely. There is a fifteen day time limit for the return of dishonored checks. *See* Doc. 21, Harvey Affidavit, Exh. D at 2 (letter from Hoke to Mahar: referring to a 15 day time limit imposed by Operating Circular # 4). After the dust settled, Norstar suffered a loss; it was stuck and had to cover the amount of the check, $21,000. Norstar commenced the instant action seeking to recover the amount of the check from Southeast.

## DISCUSSION

■ The parties have agreed as to the law which should be applied. Both New York and Florida, where Norstar and Southeast reside, have adopted Article 4 of the Uniform Commercial Code ("U.C.C.").

1. A letter from Harry A. Curth, Jr., Regional Manager of FRB–Utica, to John H. Barnes, Norstar Vice President, states that "[i]t appears from our manual records of the telephone conversation, your telephone operator gave us a 660–7739 transit number on the item in question." Docket Document ("Doc.") 21, Affidavit of Jack D. Harvey ("Harvey Affidavit"), Exhibit ("Exh.") G. Review of the manual records of FRB–Utica, however, reveals that its employee first wrote "660–*1*739," not "660–7739."

Under U.C.C. § 4–102(2), the determination of whether a bank is liable is to be made by applying the law of the place where the bank is located. Thus, Southeast's liability is governed by Florida law. The question of whether Norstar failed to exercise ordinary care is also governed by Florida law. The complaint alleges that Southeast is liable to Norstar. Southeast does not, in response argue that Norstar is liable to Southeast. Rather, Southeast's argument is that Norstar failed to exercise ordinary care and that, therefore, prevents Norstar from holding Southeast liable. Since the sole question in this action is Southeast's liability, Florida law applies. Nonetheless, even if New York law was the proper law to apply to the question of whether Norstar failed to exercise ordinary care, the outcome would most likely be unchanged. As noted by Judge Haight in *United States Fidelity and Guaranty Co. v. Federal Reserve Bank of New York*, 590 F.Supp. 486 (S.D.N.Y.1984) (*"USF & G I"*), *aff'd mem.*, 786 F.2d 77 (2d Cir.1986), in a case involving Article 4 obligations, choice of law does not impact substantive liability where both states have adopted Article 4. *Id.* at 501 n. 24 (also noting that all fifty states have adopted Article 4 of the U.C.C.).

Moving to the merits, the court observes that there are three occurrences which arguably contributed to plaintiff's failure to collect $21,000 from Ocean Bank. Defendant argues that plaintiff was negligent because its employee, Helms, should have conveyed to FRB–Utica the name of the depositary bank. By contrast, plaintiff claims that, upon receipt of the wire from FRB–Utica, defendant should not have assumed that it was the depositary bank but should have called FRB–Utica to get more information regarding the check. Finally, the check never arrived at FRB–Miami; neither party blames the other for this mishap.

■ Crucial to the motions at hand are the obligations of each party as set forth in Article 4 of the U.C.C. With respect to the check at issue in this action, defendant is a "collecting bank." F.S.A. § 674.105(4). Plaintiff is a "payor bank," F.S.A.

§ 674.105(4), and is therefore precluded from being considered a collecting bank. F.S.A. § 674.105(4). As relevant to this case, defendant's specific duties with regard to the check are set forth in F.S.A. § 674.202. Under F.S.A. § 674.202(1)(b) defendant was obligated to "use ordinary care in ... sending notice of dishonor or non-payment or returning [the check] to [its] transferor or directly to the depositary bank ... after learning that the item has not been paid or accepted, as the case may be...." In other words, once defendant learned that the check had not been accepted, it had to send notice of dishonor or return the item and it had to exercise ordinary care in the exercise of either of those options. *See USF & G I*, 590 F.Supp. at 495. Defendant was additionally required to take this action "before its midnight deadline," F.S.A. § 674.202(2), that is, before midnight of the banking day which followed the banking day on which it received the notice of dishonor. F.S.A. § 674.104(1)(h).

■ The facts with regard to defendant's inaction are not controverted. Defendant did not notify its transferor or the depositary bank, Ocean Bank in both instances. Defendant does not argue that it would have been impossible to do so. It does claim that it thought it was the depositary bank and was consequently entitled to wait until the check was returned before taking action. The court cannot adopt defendant's theory of ordinary care. Defendant's employee, Alvarez, could not locate an account for the payee on the check, D.L.V. Therefore, it remained possible that defendant was either the depositary bank or a collecting bank. Southeast's employees undertook no investigation to determine Southeast's status. Thus, Southeast left open the possibility, which was in fact the case, that it was only a collecting bank. In short, defendant did not attempt to locate information essential to the fulfillment of its statutory duty. Since defendant did not notify Ocean Bank of the dishonor, the court holds as a matter of law that defendant failed to exercise ordinary care as the standard is set forth in Article 4 of the U.C.C.

■ Defendant takes up the argument from this point and contends that it owes no duty to Norstar. It argues that it only has a duty under F.S.A. § 674.202(1)(b) to its transferor and the depositary bank, of which Norstar is neither. However, both of the *USF & G* opinions and a Florida Supreme Court case cited by both parties, stand for the proposition that defendant's duty of conveying notice extends to more than just the depositary or transferor banks. *See USF & G I*, 590 F.Supp. 486 (S.D.N.Y.1984), *later proceeding*, 620 F.Supp. 361 ("*USF & G II*"), *aff'd mem.*, 786 F.2d 77 (2d Cir.1986); *Exchange Bank of St. Augustine v. Florida Nat'l Bank*, 292 So.2d 361 (Fla.1974). Specifically, the *USF & G* court held that in cases involving Article 4 obligations "the loss [is to] be placed on the party in the best position to prevent it." 620 F.Supp. at 371. This echoes the sentiment of the Florida Supreme Court which favored a view that "if one of two innocent persons is to suffer a loss, it should be borne by the one whose negligence put in motion the flow of circumstances causing the loss." *Exchange Bank*, 292 So.2d at 363. Thus, the court's determination of responsibility is to be placed on the bank which was in the best position to prevent the loss or whose negligence generated the circumstances which led to plaintiff's loss. In addition, as a policy matter, the check clearing and rejection system is one in which each bank is highly dependent on every other bank in the check clearance chain. As a result, a bank, if injured, should be able to sue the bank which caused the injury. This promotes more care throughout the chain, which has been described as "a high stakes game of hot potato." *USF & G I*, 590 F.Supp. at 499. Accordingly, the court holds that defendant's duty to provide notice of dishonor extended to plaintiff.

■ This, however, does not determine the motions at hand. Under F.S.A. § 674.202(3) defendant is not liable for the neglect, mistake, misconduct or default of another bank, subject to an exception not relevant here. *See* F.S.A. § 674.202 comment 4. To flesh out this provision of the Code the court will review a pair of hypothetical situations. First, if a payor bank were negligent in conveying notice of dishonor and if a collecting bank were not likewise negligent, then under § 674.202(3) the collecting bank could not be held liable for the payor bank's negligence. The result would remain the same even if the collecting bank might, as a result of the payor bank's defective notice, also relay a defective notice. Second, however, is the instance where both the payor bank and the collecting bank are negligent. Yet, Article 4 does not provide for recovery based on comparative fault. Neither does it expressly forbid application of the comparative negligence doctrine. Recognizing this, in *USF & G II* the court held that the doctrine of comparative negligence does not apply to Article 4 disputes. 620 F.Supp. at 369. Instead, a version of the contributory negligence doctrine applies. As mentioned above, the *USF & G* court held that responsibility of loss should be placed on the party in the best position to prevent loss. This furthers two goals. It increases the efficiency and fraud resistance of the banking system and it speeds up resolution of disputes by establishing clear rules of liability which do not depend heavily on the specific facts of a case. The *USF & G* court fashioned a rule, which, as tailored to the present situation, reads that a negligent defendant will prevent a plaintiff from recovering for damages under Article 4, if the defendant can demonstrate that the plaintiff was negligent and that the plaintiff's negligence played a substantial role in the plaintiff's loss. 620 F.Supp. at 373.

This court is of the opinion that the contributory negligence rule would be applied in the State of Florida. In the *Exchange Bank* case, the Florida Supreme Court dealt with a situation where a collecting bank misencoded a check. As a result, another bank erroneously received it. Realizing the mistake, the second bank mailed the check back to the Federal Reserve Bank of Jacksonville. However, the Federal Reserve Bank never received the check. A photocopy of the check was obtained, but by that time the drawer's account did not

contain funds sufficient to cover the check. Consequently, the depositary bank covered the check and thereafter sued the collecting bank which had misencoded the check. In affirming a jury verdict against the collecting bank, the *Exchange Bank* court took an all or nothing approach. It held that the responsibility for coming up with the money in the check should be borne by the bank whose negligence "put in motion the flow of circumstances causing the loss." 292 So.2d at 363. This court recognizes that the *Exchange Bank* court was not contemplating whether to apply a doctrine of comparative negligence in disputes over Article 4 obligations. Nonetheless, the tenor of the *Exchange Bank* decision is that one bank, not more, will be responsible for the amount of a check when more than one bank's negligence causes the check clearing system to fail.

In the case at bar, plaintiff naturally argues that it was not negligent. Under Article 4 it had the duty of returning the check to FRB–Utica *or* providing notice of dishonor to the FRB–Utica prior to midnight of the banking day following the banking day on which it received the check. *See* F.S.A. §§ 674.301 & 674.302. It claims that it met this obligation because Wanda Helms called FRB–Utica on July 8, 1985 and because the check was returned to FRB–Utica on that day, as well.

Under F.S.A. § 673.508 notice of dishonor may be given in any reasonable manner. Defendant contends that the notice was not reasonable because plaintiff failed to inform FRB–Utica of Ocean Bank's ABA number. However, even if defendant were right, it does not follow that plaintiff failed to exercise its duties under F.S.A. §§ 674.301 and 674.302. Conveying notice of dishonor is not the only means by which plaintiff may discharge its duties under §§ 674.301 and 674.302. Return of the check to FRB–Utica before the midnight deadline suffices as well. Plaintiff returned the check on July 8, 1985, prior to its midnight deadline. Thus, plaintiff discharged its duty under §§ 674.301 and 674.302.

The only remaining provision by which plaintiff could be found responsible is F.S.A. § 674.103(1). It has been held that this section holds all banks to standards of good faith and ordinary care. *First Nat'l Bank of Florida v. Brandon State Bank,* 377 So.2d 990, 992 (Fla.App.1979), *cert. denied,* 388 So.2d 1110 (Fla.1980). Defendant has not raised good faith as an issue and therefore only Norstar's duty of ordinary care is before the court. However, defendant has not persuaded the court that § 674.103 requires more than is already mandated by §§ 674.301 and 674.302. Defendant's argument appears to be that plaintiff violated its duty of ordinary care because it did not follow the guidelines set forth by federal banking regulations. There can be no doubt that the regulations affect plaintiff's duty of care under Article 4. F.S.A. § 674.103(3). The next question is how and whether the regulations apply in this instance. With this latter question in mind the defendant brings to the court's attention a case decided in the District of Maryland, *Sun Bank/Miami v. First Nat'l Bank of Maryland,* 698 F.Supp. 1298 (D.Md.1988). Quoting from 12 C.F.R. § 210.12(c)(3) (1988), the *Sun Bank* court held that wire notices "must include certain information, such as the paying bank's name, the payee's name, the amount of the check, the reason for the return, the date of the depositary bank's indorsement, the depositor's account number, the branch at which the check was first deposited, and the tracer number." *Id.* at 1301. However, 12 C.F.R. § 210.12(c)(3) did not become effective until October 1, 1985, several months after the occurrence of the acts which are the subject of this lawsuit. *See* 50 Fed.Reg. at 5734 (1985). Prior to October 1, 1985, the regulations did not specify which facts should be included in wire notice. *See* 12 C.F.R. § 210.12 (1985). Consequently, 12 C.F.R. § 210.12(c) is inapplicable in this case.

Furthermore, even if the regulations cited in the *Sun Bank* case applied to the present case, they would not support defendant's argument. These regulations do not require notice of dishonor by wire. By their own terms they may be satisfied when the check is returned "to the bank located in a state that first handled the

item for collection." 12 C.F.R. § 210.12(c) (1988). As mentioned previously, Norstar returned the check to FRB–Utica, the first bank in New York to handle the check. This return would satisfy 12 C.F.R. § 210.12(c) (1988). In light of the foregoing analysis, the court declines to adopt defendant's argument that Norstar's notice of dishonor was defective under federal regulations.

Presumably Southeast could argue that it did not receive proper notice of dishonor and it, in turn, could not be held responsible for notifying Ocean Bank of the dishonor. However, the language of the statute does not favor such an argument. Southeast's duty to act did not accrue upon receipt of a notice of dishonor; its duty accrued "after learning that the item ha[d] not been paid or accepted, as the case may be." F.S.A. § 674.202(1)(b). In the present instance, there can be little doubt that Southeast learned that the check had not been paid or accepted.

■ Finally, even if Norstar failed to exercise ordinary care when advising FRB–Utica by phone that the check had been refused, the court holds as a matter of law that the failure to include Ocean Bank's ABA number did not play a *substantial* role in the loss which Norstar suffered. The notice conveyed to FRB–Utica and then to defendant was sufficient to put defendant on notice that the check was not accepted and that there was a substantial likelihood that Southeast was not the depositary bank. *Cf. Sun Bank,* 698 F.Supp. at 1305 (holding a depositary bank responsible for check fraud because, *inter alia,* it had not requested clarification from the Federal Reserve when it received from the Federal Reserve a wire notice of dishonor which contained erroneous information).[2] Consequently, applying the contributory

negligence doctrine enunciated in *USF & G II,* this court concludes that the failure to provide Ocean Bank's ABA number to FRB–Utica does not preclude Norstar's recovery for the amount of the check.

Accordingly, the court denies the defendant's motion and grants the plaintiff's cross-motion for summary judgment. Under F.S.A. § 674.103(5) the court is to award damages "[in] the amount of the item reduced by the amount which could not have been realized by the use of ordinary care." The court holds as a matter of law that the entire amount of the check could have been realized had defendant fulfilled its obligation under F.S.A. § 674.202(1)(b).[3] Therefore, the court directs the clerk to enter judgment in favor of Norstar and against Southeast for the full amount of the check, $21,000.

It is So Ordered.

---

**2.** In the *Sun Bank* case, the depositary bank had received a "no hit" wire, which is the same as an "insuf info" wire. After the check fraud had occurred in that case, the depositary bank instituted new procedures. It required its employees to place a call or a "service wire" to obtain additional information upon receipt of a "no hit" wire. *See Sun Bank,* 698 F.Supp. at 1305 n. 6.

**3.** If defendant had performed its duty under F.S.A. § 674.202(1)(b) it would have provided notice of dishonor to Ocean Bank by midnight of July 9, 1985. If it had received notice on July 9th, Ocean Bank would not have been able to claim that the notice of dishonor was untimely. *See* Doc. 21, Harvey Affidavit, Exh. D at 2 (15 day time limit imposed by Operating Circular # 4).